# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2605

_____

Attorney's Process and      \*
Investigation Services, Inc.,      \*
     \*
         Plaintiff-Appellant,      \*
     \*    Appeal from the United States
       v.      \*    District Court for the
     \*    Northern District of Iowa.
Sac & Fox Tribe of the      \*
Mississippi in Iowa,      \*
     \*
         Defendant-Appellee.      \*

_____

Submitted: April 13, 2010
Filed: July 7, 2010

_____

Before WOLLMAN, MURPHY, and SHEPHERD, Circuit Judges.

_____

MURPHY, Circuit Judge.

After Attorney's Process and Investigation Services, Inc. (API), a Wisconsin corporation which provides security and consulting services to casino operators, was sued in tribal court by the Sac and Fox Tribe of the Mississippi in Iowa (the Tribe), API brought this action seeking a declaratory judgment that the tribal court lacked jurisdiction and an order compelling arbitration. The Tribe's lawsuit in tribal court alleged that API committed torts while seizing control of tribal facilities on the Sac and Fox reservation under a contract signed by Alex Walker, Jr., the former Chairman of the Tribal Council.

The district court required API first to exhaust its remedies in tribal court in accord with <u>Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians</u>, 471 U.S. 845 (1985). After API returned to federal court, the district court concluded that the tribal courts did have jurisdiction over the Tribe's claims under federal law, that the validity of the API contract was a question of tribal law, and that it should accordingly defer to the tribal court finding that Walker had not had authority to bind the Tribe. The district court therefore denied API's motion for summary judgment and granted the Tribe's motion to dismiss. API appeals.

In the course of considering the issues before us we first examine the factual background of the litigation before proceeding to address the initial federal law question of whether the tribal courts have jurisdiction over the Tribe's lawsuit against API. We then turn to API's claim that it is entitled to arbitration under its contract with Walker. Finally, we summarize our conclusions and judgment. We affirm in part and reverse in part.

I.

The Sac and Fox Tribe of the Mississippi in Iowa is a federally recognized Indian tribe which owns and operates the Meskwaki Bingo Casino Hotel. The casino operation is located in Tama, Iowa on the Tribe's trust lands, known as the Meskwaki Settlement. The Tribe's governing body is a seven member council. The tribal economy depends on the casino, which the Tribe has operated for approximately fifteen years, and which generates millions of dollars in annual revenue.[1]

---

[1]According to the Meskwaki Casino's website, it is the largest full service casino in the Midwest. <u>See</u> www.meskwaki.com. At the time of the events which led to this litigation, the casino reportedly employed some 1,300 people and generated several million dollars in gross revenue per week. Mark Siebert, Casino May Reopen in 8 Weeks; The Long-Running Power Struggle on the Meskwaki Settlement Could Be Resolved by the End of November, Des Moines Register, Oct. 1, 2003, at 1B.

During the spring and summer of 2003, two groups were competing for control of the tribal government, the Tribe's finances, and the casino.[2] One group was led by Walker, who had been Chairman of the Tribal Council before the other group organized in opposition. Members of the Tribe who were dissatisfied with Walker's leadership challenged his legitimacy in September 2002 by submitting petitions demanding his recall and also that of the rest of his council. According to the tribal constitution a special election is to be called upon receipt of such petitions, but the Walker Council did not call an election. That left the petitioning tribal members without further legal recourse since there was not yet a tribal court.

The opposition to the Walker Council was led by the hereditary chief of the Tribe, Charles Old Bear. Invoking retained traditional power to form a new tribal government, Chief Old Bear appointed seven new council members. A majority of tribal members signed a declaration supporting Old Bear's actions, and at a general meeting of the tribal membership he administered oaths of office to the new council. Thereafter at another general meeting of the Tribe, a majority agreed that the members of the Walker faction were not "persons of honor, law abiding, and of good character" as the tribal constitution requires of office holders. The Bear Council and its supporters then proceeded to occupy the casino and the tribal government offices at the Tribe's community center. A special election was held on May 22, 2003, at which the Bear Council received a large majority of the votes.

The Walker Council refused to step down, however, and a standoff ensued. Since the Bureau of Indian Affairs (BIA) did not act immediately on the results of the May special election, its prior recognition of the Walker Council as the governing body remained in place and the casino was closed by the National Indian Gaming

_____

[2]See generally Sac & Fox Tribe of the Mississippi in Iowa, Election Bd. v. BIA, 439 F.3d 832 (8th Cir. 2006); In re: Sac & Fox Tribe of the Mississippi in Iowa/Meskwaki Casino Litig., 340 F.3d 749 (8th Cir. 2003). Our description of the factual background draws on those decisions as well the record in this case.

Commission (NIGC) . The Walker group then turned to litigation in an attempt to oust the Bear Council from the casino and the tribal government, but the federal courts declined to intervene because federal "jurisdiction does not exist to resolve an intra-tribal leadership dispute." Meskwaki Casino Litig., 340 F.3d at 766.

The month after the Bear Council won the tribal election on May 22, 2003, Walker brought API into the picture. Putatively acting as council chairman, he executed a contract with API in June 2003. Under their contract API agreed to "perform services directly relating to the investigation of a takeover by dissidents at the Tribe's facility located on the Tribe's reservation lands," including "[i]nvestigation of individuals involved in the unlawful acts against the Tribal Government." The agreement further indicated that API was to undertake various projects related to security, such as "[d]eveloping a security plan for the re-opening of the Tribe's Gaming Facility." The signatories agreed to arbitrate all disputes arising out of the contract.

API took the actions that eventually led to this litigation on October 1, 2003. Near dawn on that day, as the Bear Council and its supporters continued their occupation of the casino and tribal government offices, a group of approximately 30 API agents forced their way into the buildings. The two facilities are located on tribal trust land about 2.5 miles apart and are connected by a tribal road. Some of the API personnel were armed with batons, and at least one carried a firearm. They seized sensitive confidential information from both facilities related to the Tribe's gaming operations and finances. The record does not disclose what other services API may have performed under the June 2003 contract.

The Walker Council never regained control of the tribal government or the casino after API's forceful intervention. In special elections held in the fall of 2003 the Bear Council prevailed again, and in November it was recognized by the BIA as

the duly elected tribal government. Based on the BIA's action, the NIGC lifted its closure order for the casino in December 2003, and the Tribe reopened the casino.

The Tribe brought its tort action against API in the tribal trial court in August 2005, alleging that in the course of its raid on tribal facilities API had caused some $7,000 in property damage, wrongfully seized confidential information related to the Tribe's gaming operations and finances, and committed intentional torts against tribal members, including assaults, batteries, and wrongful imprisonments.[3] Based on these allegations the Tribe's complaint made claims for trespass to tribal land and chattels and misappropriation of tribal trade secrets. It also made a claim for conversion of $1,022,171.26 in tribal funds paid to API under its contract with Walker. For these acts the Tribe sought compensatory and punitive damages. API moved to dismiss, arguing that the tribal courts lacked subject matter jurisdiction and that it had a valid contract requiring arbitration.

Shortly thereafter API filed this action in the federal district court seeking a declaration that the tribal court lacked subject matter jurisdiction and an order compelling arbitration under the contract signed by Walker. API moved for a preliminary injunction against further proceedings in the tribal court. The district court denied that motion and stayed the action pending API's exhaustion of remedies in the tribal courts. See Nat'l Farmers Union, 471 U.S. at 857 (holding that federal court should not consider a challenge to tribal court jurisdiction until remedies are exhausted in tribal courts). The parties then directed their attention to proceedings in the tribal trial court.

The Tribal Court of the Sac and Fox Tribe was established by the Tribal Council in 2004. It consists of a trial court and a court of appeals. The court

---

[3]The Tribe's complaint did not seek relief for torts against any specific individual tribal members; it alleged generally that such torts had been committed.

organization, rules of procedure, and related provisions are contained in Title 5 of the Tribal Code. The Tribal Court currently has one Chief Justice of the Court of Appeals and three trial court judges, one of whom serves as chief judge. None of the judges is a member of the Sac and Fox Tribe. All are enrolled members of other tribes.[4]

After concluding that it had subject matter and personal jurisdiction, the tribal trial court denied API's motion to dismiss. It also determined that as a matter of tribal law Alex Walker, Jr. and his council had been removed from office before June 2003. Walker therefore had been without authority to bind the Tribe to the contract he entered into with API. See Sac and Fox Tribe of the Mississippi in Iowa v. Attorney's Process and Investigation Servs., Inc., No. API-CV-DAMAGES-2005-01, at 10–12 (Sac and Fox Tribe of the Mississippi in Iowa Tribal Court Mar. 26, 2008). For that reason the arbitration agreement could not be enforced.

The tribal court of appeals affirmed, holding that "the Hereditary Chief's actions of April 14, 2003 at the General Council and the Special Election on May 22, 2003 were sufficient to effect a change in Tribal leadership" and that Walker's agreement with API was therefore invalid. Sac and Fox Tribe of the Mississippi in Iowa v. Attorney's Process and Investigation Servs., Inc., No. API-CV-APP-2008-02-124, at 13 (Appellate Court of the Sac and Fox Tribe of the Mississippi in Iowa Dec. 23, 2008) (Tribal Court of Appeals Decision). It also concluded that the tribal courts had jurisdiction over the Tribe's tort claims under Montana v. United States, 450 U.S. 544, 566 (1981), since a "tribe may . . . retain inherent power to exercise civil authority over the conduct of non-Indians . . . within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." See Tribal Court of Appeals Decision at 16.

---

[4]See Tribal Court of the Sac & Fox Tribe of the Mississippi in Iowa, at http://www.meskwakicourt.org/personnel.html.

With its remedies in tribal court thus exhausted, API returned to the district court which reopened the federal case. API moved for summary judgment, seeking a declaration that the tribal courts lacked subject matter jurisdiction and that it was entitled to arbitration under the contract signed by Walker. The Tribe moved to dismiss, arguing that API's suit was barred by its sovereign immunity and that its claims lacked merit in any event.

The district court denied API's motion for summary judgment and granted the Tribe's motion to dismiss. Concluding that "API's conduct had a 'direct effect' on both the political integrity and the economic security of the Tribe," the district court determined that the tribal courts had properly exercised jurisdiction under Montana. It also concluded that whether Walker had the authority to bind the Tribe at the time he entered into the June 2003 agreement with API was a matter of tribal law. Consequently it deferred to the tribal courts' determination that Walker had not possessed that authority so the contract did not bind the Tribe. Because the Tribe never agreed to arbitrate any disputes with API, it had not waived its sovereign immunity and the arbitration agreement could not be enforced.

API timely appealed to this court. On appeal it raises the same two arguments it made in the district court. First, API maintains that the tribal courts have no subject matter jurisdiction over the Tribe's claims and that the district court erred in its application of Montana v. United States. Second, API contends that federal law rather than tribal law governs the validity of the Walker contract so the district court should not have deferred to the tribal court determination that the contract was not binding on the Tribe. API asserts that the contract binds the Tribe and that API is therefore entitled to an order compelling arbitration of the Tribe's claims.

We review de novo the district court's grant of a motion to dismiss. Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009). The extent of tribal court subject matter jurisdiction over claims against nonmembers of the Tribe is a question

-7-

of federal law which we review de novo. Nord v. Kelly, 520 F.3d 848, 852 (8th Cir. 2008). In deciding the jurisdictional issue we review findings of fact by the tribal courts for clear error and defer to their interpretation of tribal law. Prescott v. Little Six, Inc., 387 F.3d 753, 756–57 (8th Cir. 2004).

II.

Whether a tribal court has authority to adjudicate claims against a nonmember is a federal question within the jurisdiction of the federal courts. Plains Commerce Bank v. Long Family Land & Cattle Co., 128 S. Ct. 2709, 2716 (2008). Where, as here, tribal jurisdiction is not specifically authorized by federal statute or treaty, a tribe's adjudicatory authority must stem from its "retained or inherent sovereignty." Atkinson Trading Co. v. Shirley, 532 U.S. 645, 649–50 (2001). The limits of that retained power as it relates to tribal civil jurisdiction have been established primarily through judicial decisions. See Felix Cohen, Cohen's Handbook of Federal Indian Law § 7.01 (5th ed. 2005) (hereinafter Cohen).

The scope of tribal civil authority over nonmembers remained "ill-defined" as recently as 2001. Nevada v. Hicks, 533 U.S. 353, 376 (2001) (Souter, J., concurring). The controlling principles are broad and abstract and must be carefully applied to the myriad disparate factual scenarios they govern. Determining the contours of tribal civil jurisdiction and the boundaries of tribal sovereignty requires consideration of the historical scope of tribal sovereignty and the evolving place of the tribes within the American constitutional order, careful study of precedent, and ultimately a "proper balancing" of the conflicting interests of the tribes and nonmembers. Id. at 374 (opinion of the Court).

A.

For much of our nation's history, the Indian tribes were regarded as "distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial." Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 559 (1832). As such, they have been understood to "possess[] attributes of sovereignty over both their members and their territory." United States v. Mazurie, 419 U.S. 544, 557 (1975). Precisely which attributes of sovereignty the tribes retain, however, has been developing over time.

In some of its earliest decisions the Supreme Court recognized that the tribes had been divested of the sovereign power to carry on relations with foreign states by the colonization of the American continent and the tribes' relationship with the federal government. See Worcester, 31 U.S. (6 Pet.) at 559; Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543, 573–74 (1823). The tribes were long understood to exercise plenary power within their respective territories, however, subject only to the "supreme legislative authority of the United States." Talton v. Mayes, 163 U.S. 376, 384 (1896); see Worcester, 31 U.S. at 557–61; Williams v. Lee, 358 U.S. 217, 223 (1959). Thus, "[a]t one time [Indian tribes] exercised virtually unlimited power over their own members as well as those who were permitted to join their communities." Nat'l Farmers Union, 471 U.S. at 851.

Express policies of the political branches later diminished the broad scope of tribal sovereignty, see Montana, 450 U.S. at 563, and judicial decisions have divested tribes of certain aspects of sovereign power which appeared inconsistent with their status as "domestic dependent nations." Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17 (1831). In other words the tribes' "incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised." United States v. Wheeler, 435 U.S. 313, 323 (1978).

Among the most significant areas of "implicit divestiture of sovereignty . . . are those involving the relations between an Indian tribe and nonmembers of the tribe." Id. at 326. As the Supreme Court has recently observed, the "'sovereignty that the Indian tribes retain is of a unique and limited character.' It centers on the land held by the tribe and on tribal members within the reservation." Plains Commerce Bank, 128 S. Ct. at 2718 (quoting Wheeler, 435 U.S. at 323). Although there are exceptions, tribes generally no longer "possess authority over non-Indians who come within their borders." Id.

The federal principles which govern tribal civil jurisdiction over nonmembers were set out in Montana v. United States, and that decision remains the "'pathmarking case' on the subject." Hicks, 533 U.S. at 358 (quoting Strate v. A-1 Contractors, 520 U.S. 438, 445 (1997)). In Montana, the Supreme Court concluded that the Crow Tribe lacked the power to prohibit hunting and fishing by nonmembers on non Indian fee land within the reservation because "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes." 450 U.S. at 564. As a general matter, the Court held, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." Id. at 565. Accordingly, "efforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are 'presumptively invalid.'" Plains Commerce Bank, 128 S. Ct. at 2720 (quoting Atkinson, 532 U.S. at 659).

As the Supreme Court has explained, however, "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." Montana, 450 U.S. at 565. The Court has recognized two categories of nonmember conduct which may be regulated by tribes, commonly termed the "Montana exceptions." First, a "tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." Id. Second, a "tribe may also retain inherent power

-10-

to exercise civil authority over the conduct of non-Indians . . . within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566.

The Montana exceptions are rooted in the tribes' inherent power to protect certain sovereign interests. See Plains Commerce Bank, 128 S. Ct. at 2723. Paramount among those interests is the right of Indian tribes to "make their own laws and be governed by them," Hicks, 533 U.S. at 361, and in accordance with that right tribes "may regulate nonmember behavior that implicates tribal governance and internal relations." Plains Commerce Bank, 128 S. Ct. at 2723. Ultimately then, "'[t]ribal self-government' is at the heart of tribal jurisdiction." Smith v. Salish Kootenai Coll., 434 F.3d 1127, 1133 (9th Cir. 2006) (en banc) (quoting Montana, 450 U.S. at 564), cert. denied, 547 U.S. 1209 (2006).

Although the issue in the Montana case was about tribal regulatory authority over nonmember fee land within the reservation, Montana, 450 U.S. at 547, Montana's analytic framework now sets the outer limits of tribal civil jurisdiction—both regulatory and adjudicatory—over nonmember activities on tribal and nonmember land. The Supreme Court held in Strate v. A-1 Contractors that "[a]s to nonmembers . . . a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction." Strate, 520 U.S. at 453.[5] Tribal court jurisdiction thus "turns upon whether the actions at issue in the litigation are regulable by the tribe." Hicks, 533 U.S. at 367 n.8. The Court has also indicated that "Montana applies to both Indian and non-Indian land."

---

[5]Although in Hicks the Supreme Court reserved the question "whether a tribe's adjudicative jurisdiction over nonmember defendants equals its legislative jurisdiction," 533 U.S. at 358 (emphasis in original), it has indicated that "where tribes possess authority to regulate the activities of nonmembers, 'civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts,'" Strate, 520 U.S. at 453 (quoting Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 18 (1987)) (alterations omitted).

-11-

Id. at 360; see also id. at 387 (O'Connor, J., concurring in part) ("Today, the Court finally resolves that Montana v. United States governs a tribe's civil jurisdiction over nonmembers regardless of land ownership.") (citation omitted); MacArthur v. San Juan County, 497 F.3d 1057, 1069–70 (10th Cir. 2007).

Because "efforts by a tribe to regulate nonmembers . . . are presumptively invalid," the Tribe bears the burden of showing that its assertion of jurisdiction falls within one of the Montana exceptions. Plains Commerce Bank, 128 S. Ct. at 2720 (quotation marks omitted). Those exceptions are narrow ones and "cannot be construed in a manner that would 'swallow the rule.'" Id. (quoting Atkinson Trading Co., 532 U.S. at 655).

## B.

The district court determined that the tribal courts could exercise jurisdiction over the Tribe's claims under the second Montana exception. That exception provides that tribal courts have authority over nonmember conduct which "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Montana, 450 U.S. at 566. In particular, the district court concluded that by attempting to seize control of the casino and government offices during an intratribal governance dispute, API directly affected both the political integrity and the economic security of the Tribe.

API disputes that the second Montana exception provides the tribal courts with jurisdiction. It maintains that the district court erred in its application of Montana by overestimating the effect of its conduct on the Tribe's sovereign interests and by considering acts that were irrelevant to the analysis. The Tribe supports the district court's reasoning, maintaining that API's conduct at its facilities interfered with its right to self government and threatened its economic well being.

-12-

The starting point for the jurisdictional analysis is to examine the specific conduct the Tribe's legal claims would seek to regulate. The Montana exceptions focus on "'the activities of nonmembers' or 'the conduct of non-Indians.'" Plains Commerce Bank, 128 S. Ct. at 2720 (quoting Montana, 450 U.S. at 565–66) (emphasis in original). Each claim must be analyzed individually in terms of the Montana principles to determine whether the tribal court has subject matter jurisdiction over it. See Hicks, 533 U.S. at 367 n.8 (limitations on tribal jurisdiction "pertain[] to subject-matter, rather than merely personal, jurisdiction"); Plains Commerce Bank, 128 S. Ct. at 2724–25 & n.2; cf. Myers v. Richland County, 429 F.3d 740, 747–48 (8th Cir. 2005) (examining federal court subject matter jurisdiction claim by claim).

In analyzing the jurisdictional issue we rely on the record developed in the tribal courts and the allegations in the Tribe's complaint. Questions of subject matter jurisdiction often require resolution of factual issues before the court may proceed, see, e.g., Osborn v. United States, 918 F.2d 724, 728–30 (8th Cir. 1990), and that is particularly true of inquiries into tribal jurisdiction. It is therefore both necessary and appropriate for the parties and the tribal court to ensure that "a full record [is] developed in the Tribal Court." Nat'l Farmers Union, 471 U.S. at 856. Here, the parties were afforded discovery in the tribal trial court. API has not contested any of the material allegations made by the Tribe, and we therefore take them as true for present purposes.

The parties disagree about which particular facts are relevant to the Montana analysis. API contends that the court should consider only the elements of the tribal regulation or cause of action at issue in evaluating its conduct. Because the tort claims might not in the ordinary course "'imperil the subsistence' of the tribal community," API maintains the tribal courts have no jurisdiction. Plains Commerce Bank, 128 S. Ct. at 2726 (quoting Montana, 450 U.S. at 566). The Tribe contends that in deciding

-13-

the question of jurisdiction the court must focus on what actually occurred at the tribal facilities.

API's theory of tribal jurisdiction suffers from several flaws. The most significant is that it has no grounding in precedent. In support of its theory API does rely on Plains Commerce Bank, but its reading of that case does not withstand scrutiny. At issue in Plains Commerce Bank was a discrimination claim based on traditional tribal law. Id. at 2725. Rather than focusing on the elements of that tribal claim, the Supreme Court was concerned with the practical regulatory effect the claim would have on the nonmember conduct at issue. It concluded that in effect the plaintiffs' claim "operate[d] as a restraint on alienation" of the non-Indian defendant's land. Id. at 2721. Plains Commerce Bank thus demonstrates that courts applying Montana should not simply consider the abstract elements of the tribal claim at issue, but must focus on the specific nonmember conduct alleged, taking a functional view of the regulatory effect of the claim on the nonmember.

This approach is illustrated in decisions of other courts. For example, in Elliott v. White Mountain Apache Tribal Court, 566 F.3d 842, 849 (9th Cir. 2009), the Ninth Circuit considered the extent of the alleged damage before deciding that a tribe had colorable jurisdiction to enforce regulations prohibiting trespass and requiring a permit to make a fire on tribal land. The court noted that "the regulations at issue are intended to secure the tribe's political and economic well-being, particularly in light of the result of the alleged violations of those regulations in this very case: the destruction of millions of dollars of the tribe's natural resources." Id. at 850. The court's decision thus did not rest solely on the categorical elements in the tribal regulations, but on "the circumstances of this case." Id.

API's theory also suffers from a conceptual flaw. In maintaining that tribal adjudicatory jurisdiction turns on the elements of the regulation or cause of action the Tribe seeks to enforce, API assumes that the limits on tribal jurisdiction are a function

-14-

of positive tribal law. That assumption misapprehends the source of Indian tribes' civil authority, as well as the nature of an appropriate inquiry under Montana.

The Montana exceptions recognize that the Indian tribes "retain inherent sovereign power," Montana, 450 U.S. at 565, and our task in applying the exceptions is to outline the boundaries of that retained power. Those boundaries are established by federal law, a source of law external to the tribes. See, e.g., Nat'l Farmers Union, 471 U.S. at 852. Positive tribal law, in contrast, is internal to the tribes. It is a manifestation of tribal power, and as such it does not contribute to the external limitations which concern us here. Once it is determined that certain conduct is within the scope of a tribe's power as a matter of federal law, our inquiry is at an end.

This point is illustrated by API's implicit concession that the Tribe might have jurisdiction in this case if only it had written regulations which specifically prohibited "hijacking the casino, interfering with elections, and deposing [the Tribe's] governing council." See API Opening Br. at 22. We need not pause to consider how foreseeable such conduct would have been because the absence of such regulations is irrelevant in the factual context of this case. If the Tribe retains the power under Montana to regulate such conduct, we fail to see how it makes any difference whether it does so through precisely tailored regulations or through tort claims such as those at issue here.

We conclude that the allegations relevant to our jurisdictional inquiry are not limited to those that track the elements of the Tribe's claims. The context is also significant, and other aspects of the conduct the claims seek to regulate are pertinent to the extent they demonstrate encroachment upon the tribal sovereign interests recognized by Montana and its progeny. We turn then to the Tribe's allegations.

The Tribe's claims arise from two related, but ultimately distinct, courses of conduct which occurred subsequent to the election of the Bear Council and API's

-15-

agreement with Walker. First, the Tribe alleges that between the time the contract was signed in June and the end of September 2003, API took possession of over $1 million in tribal funds without the authorization of the Tribe's duly elected governing body. The Tribe's conversion claim arises from this transaction (or set of transactions). Second, the Tribe's complaint describes API's raid on the casino and the government offices, leading to the claims for trespass to land, trespass to chattels, and conversion of tribal trade secrets.

We consider the latter claims first. According to the Tribe's allegations, on October 1, 2003 API's armed agents entered onto tribal trust land without permission of the elected governing body, stormed buildings vital to the Tribe's economy and its self government, committed violent torts against tribal members, forcibly seized sensitive information related to the Tribe's finances and gaming operations, and damaged tribal property. The conduct set out in these allegations "menace[d] the 'political integrity, the economic security, [and] the health [and] welfare" of the Tribe to such a degree that it "'imperil[ed] the subsistence' of the tribal community." Plains Commerce Bank, 128 S. Ct. at 2726 (quoting Montana, 450 U.S. at 566). The Tribe therefore retains the inherent power under the second Montana exception to regulate this conduct.

API threatened the health and welfare of the Tribe by organizing a physical attack by thirty or more outsiders armed with batons and at least one firearm against the Tribe's facilities and the tribal members inside, including the duly elected council. While the "generalized threat that torts by or against its members pose for any society[] is not what the second Montana exception is intended to capture," Philip Morris USA, Inc. v. King Mountain Tobacco Co., 569 F.3d 932, 943 (9th Cir. 2009), the Tribe's allegations describe no ordinary torts. To the contrary, API directly threatened the tribal community and its institutions. Its agents' actions against the Tribe's newly elected council and its supporters during the dawn takeover could easily have led to wider violence. Conduct reasonably likely to result in violence on tribal

-16-

lands sufficiently threatens tribal health and welfare to justify tribal regulation. See Babbitt Ford, Inc. v. Navajo Indian Tribe, 710 F.2d 587, 593 (9th Cir. 1983).

As alleged, API's conduct also threatened the political integrity and economic security of the Tribe. Its apparent purpose in raiding the Tribe's facilities was to seize control of the tribal government and economy by force.[6] The dawn attack was directed at the Tribe's community center—the seat of tribal government—and the casino, which the tribal appellate court characterized as "the Tribe's economic engine." Tribal Court of Appeals Decision at 16. As it appears from the allegations, the raid sought to return the Walker Council to power despite the majority's rejection of its leadership in the May election. This was a direct attack on the heart of tribal sovereignty, the right of Indians "to protect tribal self-government." Montana, 450 U.S. at 564.[7]

Finally, there remains "the critical importance of land status" to questions of tribal jurisdiction under Montana. Plains Commerce Bank, 128 S. Ct. at 2725. Here, the Tribe does not seek to assert jurisdiction over non Indian fee land. The facilities API raided are on tribal trust land. The Tribe's trespass and trade secret claims thus seek to regulate API's entry and conduct upon tribal land, and they accordingly "stem from the tribe's 'landowner's right to occupy and exclude.'" Elliott, 566 F.3d at 850 (quoting Hicks, 533 U.S. at 359). A "tribe's 'traditional and undisputed power to exclude persons' from tribal land . . . gives it the power to set conditions on entry to

---

[6]API's alleged conduct fits the dictionary definition of an attempted coup d'etat: a "sudden . . . change of government through seizure of power." Black's Law Dictionary 378 (8th ed. 2004).

[7]No jurisdictional significance has been established by the fact that the BIA and NIGC still recognized the Walker Council at the time of the raid. As discussed in Part III.B, infra, these federal agencies are without power to interfere in an intratribal governance dispute. Their recognition could not give API license to do what the agencies themselves could not.

that land." Plains Commerce Bank, 128 S. Ct. at 2723 (quoting Duro v. Reina, 495 U.S. 676, 696 (1990)).  Tribal civil authority is at its zenith when the tribe seeks to enforce regulations stemming from its traditional powers as a landowner.  See Hicks, 533 U.S. at 370 ("[T]ribal ownership is a factor in the Montana analysis, and a factor significant enough that it may sometimes be dispositive.") (ellipsis and quotation marks omitted); Strate, 520 U.S. at 454; Elliott, 566 F.3d at 849–50.  Adjudication of the trespass and trade secret claims is accordingly well within the Tribe's retained power under Montana.

We conclude that because API's forceful intervention on October 1, 2003 threatened the "political integrity, the economic security, [and] the health [and] welfare" of the Tribe, Montana, 450 U.S. at 566, as well as its rights as a landowner, the tribal courts may exercise jurisdiction over the claims that arise out of that conduct.  See Plains Commerce Bank, 128 S. Ct. at 2724, 2726 (tribes retain "inherent sovereign authority to set conditions on entry, preserve self-government, [and] control internal relations").  The Tribe's claims for trespass to tribal land and chattels and conversion of tribal trade secrets grow out of this sovereign authority.

The Tribe's claim for conversion of tribal funds is materially different from the other alleged torts, however.  The conversion claim does not appear to arise directly out of what occurred during the October 1 raid.  It arises from the payment of tribal funds to API under its contract with Walker.  According to the tribal trial court's factual findings, all of the money the Tribe now seeks to recover had been paid to API by September 30, the day before the raid occurred.  The district court may have overlooked that fact since it focused its discussion entirely on API's conduct on October 1.  It is of course possible that API was paid in advance for planning and executing the raid, but that has not been alleged.

In order to establish jurisdiction over the conversion claim under the second Montana exception, the Tribe must show that the conduct it seeks to regulate occurred

within the Meskwaki Settlement, for "Montana and its progeny permit tribal regulation of nonmember conduct inside the reservation."  Plains Commerce Bank, 128 S. Ct. at 2721 (second emphasis added).  The conduct the conversion claim seeks to regulate most directly is API's unauthorized receipt and retention of tribal funds. See, e.g., Restatement (Second) of Torts §§ 222A, 229; cf. United States v. Janis, 556 F.3d 894, 898 (8th Cir. 2009) (defendant's "receipt and retention" of tribal funds transferred in violation of tribal policy was "conversion" under 18 U.S.C. § 1163). The Tribe makes no allegation that the receipt or retention of the funds occurred within the Meskwaki Settlement, however, so we cannot conclude that the conduct most directly regulated by the conversion claim occurred on tribal land.

Nor has the Tribe adequately delineated an indirect relationship between the conversion claim as a whole and API's conduct on tribal land, for it remains unclear what portion of the allegedly converted funds may relate to the October 1 raid, as opposed to other services API might have performed under the contract with Walker. The tribal appellate court stated that the "Walker Council paid API these funds in exchange for API's performance of some of the actions" of October 1, Tribal Court of Appeals Decision at 16, but the record does not illuminate the issue any further.  The tribal trial court's only relevant factual finding was that API received $1,022,171.26 in tribal funds between June 30, 2003 and September 30, 2003.  Because we cannot determine what services these funds paid for, we cannot examine what conduct by API the conversion claim seeks to regulate.

That some of the funds likely relate to the October 1 raid is not enough to sustain jurisdiction over the claim as a whole, for "when it comes to tribal regulatory authority, it is not 'in for a penny, in for a Pound.'"  Plains Commerce Bank, 128 S. Ct. at 2724 (quoting Atkinson, 532 U.S. at 656).  We conclude that the Tribe has failed to carry its burden of establishing adjudicatory jurisdiction over the conversion claim under the second Montana exception.

The question remains, however, whether the first Montana exception could provide tribal court jurisdiction over the conversion claim. That exception recognizes tribal power to regulate nonmembers when they "enter consensual relationships with the tribe or its members." Montana, 450 U.S. at 565. The tribal appellate court concluded that the first exception did not apply because the Tribe's claims "are premised on lack of consent and turn on the Tribe's claim that there was no valid Contract" between it and API. Tribal Court of Appeals Decision at 16 (emphasis in original). Although the district court expressed agreement with that proposition, it did not analyze or ultimately decide whether the first Montana exception applies to any of the Tribe's claims. The Tribe now urges that the first exception establishes jurisdiction over all of its claims. API disagrees.

Whether the contract between API and Walker was binding on the Tribe is an issue separate from the question of whether the contract could establish tribal court jurisdiction over the Tribe's claims, for the consensual relationship contemplated by the first Montana exception may be with the Tribe itself "or its members." Montana, 450 U.S. at 565. Even if the contract did not bind the Tribe, the operative question for jurisdictional purposes is whether the conversion claim has a sufficient nexus to the consensual relationship between Walker and API. Atkinson, 532 U.S. at 656; see Nord, 520 F.3d at 856. We decline to answer that question without the benefit of analysis by the district court. We therefore conclude that a remand is necessary so that the district court may consider the applicability of the first Montana exception to the Tribe's conversion claim.

### III.

API contends that regardless of whether the tribal courts have subject matter jurisdiction under Montana, its contract with Walker binds the Tribe and requires arbitration of the claims brought against it. After concluding as a matter of tribal law that the Bear Council had been legally installed to lead the Tribe in the May 2003

-20-

election, the tribal courts determined that Walker had no authority to bind the Tribe to the contract he subsequently entered into in June. The district court deferred to that determination of tribal law and therefore agreed that the arbitration clause in the contract was not enforceable against the Tribe. Because the duly elected tribal authority had not agreed to the arbitration provision, the district court concluded that the Tribe's sovereign immunity barred API's claim for enforcement of the arbitration clause. API continues to maintain that the arbitration clause is binding, particularly since some federal agencies continued to recognize Walker as the tribal chairman at the time he entered into the contract with it.

A.

The parties disagree about the scope of our review of API's arbitration claim. API maintains that we must review de novo all matters of federal law decided by the tribal court including the arbitration issue. The Tribe argues however that our review is limited to determining whether the tribal courts had jurisdiction over the issue. If they did, the Tribe contends, we should accord preclusive effect to their determination that the contract was invalid.

The Supreme Court's guidance in this area has been limited. It held in <u>Iowa Mutual Insurance Co. v. LaPlante</u> that "[u]nless a federal court determines that the Tribal Court lacked jurisdiction, . . . proper deference to the tribal court system precludes relitigation of issues raised by the [underlying] claim and resolved in the Tribal Courts." 480 U.S. at 19. That decision has been understood as establishing "the rule that federal courts may not readjudicate questions—whether of federal, state or tribal law—already resolved in tribal court absent a finding that the tribal court lacked jurisdiction or that its judgment be denied comity for some other valid reason."

-21-

AT&T Corp. v. Coeur d'Alene Tribe, 295 F.3d 899, 904 (9th Cir. 2002).[8] The Ninth Circuit thus reviews de novo a tribal court's resolution of those matters of federal law which are relevant to the tribal court's jurisdiction, but gives preclusive effect to tribal judgments on other issues under a comity analysis. See id. at 903–04; Wilson v. Marchington, 127 F.3d 805, 810 (9th Cir. 1997).

We stated in dictum in Prescott v. Little Six, Inc. that "when the tribal court applies federal law [its] determinations are accorded no deference and are reviewed by the district court de novo," citing Duncan Energy Co. v. Three Affiliated Tribes of the Ft. Berthold Reservation, 27 F.3d 1294, 1300 (8th Cir. 1994). Prescott, 387 F.3d at 757. In Duncan the court mentioned the de novo standard only in the course of discussing tribal court jurisdictional determinations, however, and it relied on FMC v. Shoshone-Bannock Tribes, 905 F.2d 1311, 1313 (9th Cir. 1990). See Duncan, 27 F.3d at 1300. The Ninth Circuit has subsequently explained that FMC did not require a de novo standard for all federal issues, but "merely established a de novo standard of review for legal questions relevant to a tribal court's decision regarding tribal jurisdiction." Coeur d'Alene Tribe, 295 F.3d at 904 (emphasis in original).[9]

---

[8]See also Timothy W. Joranko, Exhaustion of Tribal Remedies in the Lower Courts After National Farmers Union and Iowa Mutual: Toward a Consistent Treatment of Tribal Courts by the Federal Judicial System, 78 Minn. L. Rev. 259, 295 (1993) ("Iowa Mutual makes clear that the parties may not relitigate their federal claims beyond the jurisdictional challenge, unless and until the federal court determines that the tribal court lacked jurisdiction over the dispute.").

[9]A de novo standard of review for all questions of federal law decided by tribal courts would also appear to take inadequate account of the fact that "the tribes remain quasi-sovereign nations which . . . are in many ways foreign to the constitutional institutions of the Federal and State Governments." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 71 (1978); see also Duncan, 27 F.3d at 1302 (Loken, J., concurring) ("I do not agree that . . . we conduct some sort of direct review of the tribal court. . . . I know of no statute giving the district and circuit courts jurisdiction to review tribal court decisions.").

-22-

Even if our precedent provides uncertain guidance on the standard for review of tribal court decisions of federal law issues, we need not linger over the question here. The district court determined that the question of whether Walker had authority to bind the Tribe to the June 2003 agreement with API is purely a matter of tribal law. If that conclusion was correct, we need not decide in this case whether de novo review applies to tribal court decisions of nonjurisdictional issues of federal law. The rule is clear that federal courts do not conduct de novo review over tribal court rulings under tribal law. Prescott, 387 F.3d at 756; City of Timber Lake v. Cheyenne River Sioux Tribe, 10 F.3d 554, 559 (8th Cir. 1993), cert. denied, 512 U.S. 1236 (1994).

B.

API argues that the district court should not have deferred to the tribal courts' conclusion about the validity of the contract because that issue is governed by federal law, not tribal law. API contends that Walker had authority under federal law to take any action necessary to operate the casino, including contracting with API on behalf of the Tribe, because the BIA and NIGC still recognized the Walker Council as the Tribe's governing body through the summer of 2003. API's reliance on federal agency recognition of the Walker Council is misplaced.

Of special significance is the long established principle that "[t]ribal election disputes, like tribal elections, are key facets of internal tribal governance and are governed by tribal constitutions, statutes, or regulations." Cohen § 4.06[1][b][i]. We have reaffirmed this rule in relation to the very governance dispute underlying this case. See Meskwaki Casino Litig., 340 F.3d at 763–64. Because tribal governance disputes are controlled by tribal law, they fall within the exclusive jurisdiction of tribal institutions, see id., and the BIA's recognition of a member or faction is not binding on a tribe, Goodface v. Grassrope, 708 F.2d 335, 339 (8th Cir. 1983).

While the BIA may at times be obliged to recognize one side in a dispute as part of "its responsibility for carrying on government relations with the Tribe," such recognition is made only on "an interim basis." Id. Once the dispute is resolved through internal tribal mechanisms, the BIA must recognize the tribal leadership embraced by the tribe itself. Id.; see also Wheeler v. U.S. Dep't of the Interior, Bureau of Indian Affairs, 811 F.2d 549, 552–53 (10th Cir. 1987); Cohen § 4.06[1][b][ii]. The BIA recognizes the force of these principles. See Wanatee v. Acting Minneapolis Area Director, BIA, 31 I.B.I.A. 93, 95 (Interior Bd. of Indian Appeals July 30, 1997).

It is plain, then, that whether Walker was properly removed from office and whether he had general authority to act on behalf of the Tribe in a governmental capacity are pure questions of tribal law, beyond the purview of the federal agencies and the federal courts. API concedes this proposition as it must. It argues, however, that federal law empowered Walker in a more limited and specific manner. API contends that NIGC's notice of violation and order closing the casino authorized Walker to take self help remedies in retaking control, pointing in particular to a statement in the notice of violation that the Bear Council's occupation of the casino "leaves the federally recognized government unable to regain control without the use of force."[10] More broadly, API contends that because Indian gaming is a federally regulated activity, the federal agencies' recognition of Walker empowered him to act on behalf of the Tribe for purposes of operating the casino, and thus to enter into the contract with API despite having been replaced by the election of the Bear Council.

As for the first contention, the NIGC actions had neither the purpose nor the legal consequences API ascribes to them. The notice of violation and closure order disclose no intent to empower Walker to employ force by outsiders to retake the casino. To say that the Bear Council was not authorized at that point to operate the

_____

[10] Notice of Violation, No. NOV-03-02, at 2 (NIGC Apr. 30, 2003), available at http://www.nigc.gov/Reading_Room/Enforcement_Actions.aspx.

-24-

casino was not to say that Walker could do whatever he thought necessary to reopen it. The point of the NIGC reference about the potential for the use of force was that the situation at the casino posed a threat to public safety, thus violating federal gaming law and regulations. API seeks to justify its raid on the Tribe's facilities on tribal trust land by seizing on a few words of the NIGC order isolated from their context. The NIGC did not authorize the use of force in its notice, and certainly not by private actors employed by one faction in an intratribal dispute.

Moreover, the NIGC lacked the power to authorize Walker to hire API with tribal funds to conduct its raid. As the notice of violation itself makes clear, the "NIGC defers to the Secretary of the Interior," acting through the BIA, in determining "which faction should be recognized as the tribal government." Notice of Violation at 1 (citing 25 U.S.C. § 2703(5)(A)). Any recognition of Walker at this point had no special force. NIGC simply deferred the issue to the BIA, which acknowledges that it lacks the power to determine tribal leadership. It must nonetheless still conduct government to government relations on an interim basis during a tribal leadership dispute. See Wanatee, 31 I.B.I.A. at 95.

API's more general argument is that federal law governs the validity of the contract between API and Walker because its subject matter was operation of a federally regulated casino. This argument is foreclosed by our precedent. We have held under circumstances similar to those here, that whether a former tribal leader has authority to bind his tribe to a casino management contract is a matter of tribal law. In Bruce H. Lien Co. v. Three Affiliated Tribes, 93 F.3d 1412 (8th Cir. 1996), the tribes had entered into a casino management contract with the Lien Company. Id. at 1414. The tribal leader who had executed the agreement subsequently lost his bid for reelection, and the new leadership claimed he had not been authorized to bind the tribe. Id. at 1415–16. We reversed the district court's determination that the NIGC had "exclusive initial jurisdiction to determine the validity of the contract." Id. at 1416. We concluded to the contrary that "the legal validity of the management

contract [was] beyond the authority of the NIGC," and that jurisdiction to determine its validity lay in the tribal court. Id. at 1417. Further, "the issue of the contract's validity [did] not raise a federal question per se." Id. at 1421.

Prescott v. Little Six, Inc. resolved a parallel choice of law problem in a similar manner. In Prescott, former employees of Little Six (a tribal corporation organized under tribal law to run the tribe's casino), sued to recover payments under draft employee benefit plans created by the company. 387 F.3d at 754. Little Six claimed that the benefit plans had not been created in accordance with tribal corporate law and were therefore not binding. Id. The district court concluded that because the benefit plans were governed by ERISA, their validity was a question of federal law. Id. at 757. We reversed, recognizing that "the initial, and dispositive, issue . . . was whether a valid and enforceable benefits arrangement existed." Id. That issue was "a matter governed by tribal law" and we therefore deferred to the tribal court's determination that the draft plans were invalid. Id. at 757–58.

The present case is on all fours with Bruce H. Lien and Prescott. API recognizes that Walker's authority to act on behalf of the Tribe in general is a matter of tribal law. Our decisions in Bruce H. Lien and Prescott repudiate any notion that federal regulation of gaming could create some special sphere of federal law by which Walker could be empowered to bind the Tribe after it had elected new leaders.

API also argues that even if Walker was without authority to bind the Tribe to the agreement as a whole, he had independent federal authority to waive the Tribe's sovereign immunity because tribal sovereign immunity is a creature of federal law. This is essentially the same argument API offers with respect to the contract as a whole, and we reject it for the same reasons. The fact that federal law provides for tribal sovereign immunity did not cloak Walker with authority to waive the Tribe's immunity, just as federal regulation of gaming did not federalize the Tribe's internal governance disputes as they related to casino management. Walker simply lacked

-26-

authority to act on behalf of the Tribe in any capacity, and this "calls into question all provisions" in the contract, "including provisions relating to arbitration [and] sovereign immunity." Bruce H. Lien, 93 F.3d at 1417.

API advances a number of policy based arguments in support of its position. It contends for example that the inability of third parties to rely on federal agency recognition of a particular tribal government could interfere with the provision of services to Indian tribes. Such contentions are irrelevant, for the ultimate flaw in API's argument is that it points to no federal statute, treaty, or regulation manifesting congressional intent to authorize the encroachment upon tribal sovereignty that API proposes.

It is Congress—not the federal judiciary—which enjoys "plenary and exclusive" power over the Indian tribes, United States v. Lara, 541 U.S. 193, 200 (2004); see Williams, 358 U.S. at 223; Lone Wolf v. Hitchcock, 187 U.S. 553, 565 (1903), and thus "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent." Santa Clara Pueblo, 436 U.S. at 60. There is no indication that Congress has granted the BIA or NIGC the authority API claims for them, or that it intended the Indian Gaming Regulatory Act to displace the right of tribal members to select the leaders who will act on their behalf. Absent clear evidence of legislative intent, we will not infer that Congress has so drastically curtailed tribal sovereignty.

The district court properly deferred to the tribal courts' determination that the June 2003 agreement between Walker and API did not bind the Tribe. See Prescott, 387 F.3d at 758. Because the Tribe did not enter into any agreement with API, it has not waived its sovereign immunity, and it is therefore immune from suit on the contract. See Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 760 (1998).

Accordingly, the district court did not err in dismissing API's claim for enforcement of the arbitration agreement.

## IV.

For the foregoing reasons, we affirm the judgment of the district court insofar as it held that the courts of the Sac and Fox Tribe may exercise adjudicatory jurisdiction over the Tribe's claims against API for trespass to land, trespass to chattels, and conversion of tribal trade secrets. We also affirm the judgment of the district court dismissing API's claim for an order compelling arbitration.

We reverse and vacate only that portion of the judgment which concluded that the Tribal Court has jurisdiction under the second <u>Montana</u> exception over the Tribe's claim for conversion of tribal funds, and we remand to the district court the question of whether tribal court jurisdiction exists over that claim under the first <u>Montana</u> exception.

_____