# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1295

_____

Larry C. Flynt

*Intervenor - Appellant*

Earl Ringo; John C. Middleton; Russell Bucklew; John E. Winfield; Dennis
Skillicorn; Leon Taylor; Roderick Nunley; Jeffrey R. Ferguson; Richard D. Clay;
Allen L. Nicklasson; Joseph Franklin; Martin Link; Mark Christeson; William L.
Rousan; David Barnett; Cecil Clayton; Michael Anthony Taylor; Herbert Smulls

*Plaintiff*s

v.

George A. Lombardi; Terry Russell; John Doe

*Defendants - Appellees*

_____

No. 16-2232

_____

Larry C. Flynt

*Intervenor - Appellant*

Earl Ringo; John C. Middleton; Russell Bucklew; John E. Winfield; Dennis
Skillicorn; Leon Taylor; Roderick Nunley; Jeffrey R. Ferguson; Richard D. Clay;
Allen L. Nicklasson; Joseph Franklin; Martin Link; Mark Christeson; William L.
Rousan; David Barnett; Cecil Clayton; Michael Anthony Taylor; Herbert Smulls

*Plaintiff*s

v.

George A. Lombardi; Terry Russell; John Doe

*Defendants - Appellees*

_____

Appeals from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: January 9, 2018
Filed: March 13, 2018

_____

Before LOKEN, BEAM, and KELLY, Circuit Judges.

_____

BEAM, Circuit Judge.

Intervenor Larry Flynt appeals the district court's[1] denial of his motion to unseal certain judicial records regarding death row inmates' challenges to Missouri's lethal injection protocol. We affirm.

## I.    BACKGROUND

The underlying litigation in this matter involves an omnibus Eighth Amendment challenge to Missouri's execution protocol. Ringo v. Lombardi, 677 F.3d 793 (8th Cir. 2012). During the course of that litigation, state government agencies filed documents under seal in order to be able to carry out executions. Flynt

_____

[1]The Honorable Beth Phillips, United States District Judge for the Western District of Missouri.

sought to intervene at some point during that litigation. In a 2015 per curiam opinion, we reversed the district court's denial of Flynt's motion to intervene and held that Federal Rule of Civil Procedure 24(b) was the proper procedural vehicle for Flynt to utilize to intervene in the case. Flynt v. Lombardi, 782 F.3d 963, 967 (8th Cir. 2015) (per curiam).

Upon remand, Flynt intervened and requested that the district court unseal documents relating to Missouri's death penalty protocol litigation. Flynt sought information from depositions taken during the case and other documents specifically relating to the professional qualifications of two medical members of the execution team, M3 and M2. The district court denied the motion, finding that Flynt was not entitled to the documents he sought under the First Amendment, in part because our circuit has not yet recognized a First Amendment right of access in civil cases. The district court also found that Flynt would not have met the First Amendment test because the analysis was not meaningfully different from the common-law test, which Flynt did not meet either. With regard to the First Amendment test, the district court found that access can be denied if there is a compelling governmental interest, and if the denial is narrowly tailored to serve that interest. The protection of privacy rights was an example cited by the district court that would justify a denial of First Amendment access to otherwise public information. Likewise, the common-law test–essentially a balancing test between the competing request for access and the reasons for sealing–resulted in favor of the State's interest in keeping the information sealed based on a similar analysis.

In orders entered in November and December of 2015, just prior to ruling on the original motion to unseal, the district court directed the State to file supplemental briefing on whether redaction would satisfy both the State's interests in keeping the sensitive information private and Flynt's interest in access to the documents. See IDT Corp. v. eBay, 709 F.3d 1220, 1224-25 (8th Cir. 2013) (remanding to the district court for a determination of whether redaction of confidential business information

was practicable so that a part of the pleadings could be unsealed). The State received permission to file that briefing under seal for *in camera* review, and thus did not provide that supplemental briefing to Flynt's counsel. The State also filed an unsealed, redacted version. The district court relied upon this sealed supplemental briefing in ruling that redaction would not be an effective way of allowing the documents to become public, finding that the depositions and the licensure information could not be redacted in a way that would disclose the information Flynt sought without also revealing M3's identity.

Several months later, apparently while preparing his appellate brief for the First Amendment/common-law case, Flynt discovered that the State had filed the supplemental brief under seal for *in camera* review[2] by the district court and that consequently, his counsel did not and could not review it. Flynt moved to review this supplemental briefing. The district court denied this motion as untimely and alternatively, on the merits. Flynt appeals both the original ruling regarding the sealing of the discovery and licensing documents, and the second order dealing with the sealed supplemental briefing.

## II.  DISCUSSION

We review de novo the district court's legal conclusions about the common law and First Amendment right of access to judicial records. United States v. McDougal, 103 F.3d 651, 659 (8th Cir. 1996). A court has supervisory control over its records, however, and we review the district court's ultimate decision to seal or unseal for an

---

[2]As the district court noted in a May 11, 2016 order, *in camera* review is generally known as indicating that "something is being reviewed privately by the judge. *E.g.*, Black's Law Dictionary 828 (9th ed. 2009) (definition of "in camera inspection.")."

abuse of discretion.  Webster Groves Sch. Dist. v. Pulitzer Publ'g Co., 898 F.2d 1371, 1376 (8th Cir. 1990).

### A.    Common Law

Generally speaking, there is a common-law right of access to judicial records, but that right is not absolute.  Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597-98 (1978); IDT, 709 F.3d at 1222.  The primary rationales for this right are the public's confidence in, and the accountability of, the judiciary.  IDT, 709 F.3d at 1222.  Whether the common-law presumption can be overcome is determined by balancing "the interests served by the common-law right of access . . . against the salutary interests served by maintaining confidentiality of the information sought to be sealed."  Id. at 1223.  In order to adjudicate the issue, a court must first decide if the documents in question are "judicial records," and if so, must next consider whether the party seeking to prevent disclosure has overcome the common-law right of access that would otherwise apply to such records.  Id. at 1222-23.  The presumption of public access to judicial records may be overcome if the party seeking to keep the records under seal provides compelling reasons for doing so.  In re Neal, 461 F.3d 1048, 1053 (8th Cir. 2006).

The district court agreed with Flynt that the documents in question were "judicial records," but found that the State had overcome the public's common-law right of access to such records.  The personal and professional safety of one or more members of the execution team, as well as the interest of the State in carrying out its executions, were sufficiently in jeopardy to overcome the common-law right of public access to the records.  The State presented evidence from other jurisdictions wherein compounding pharmacists, once identities were revealed, were harassed and threatened.  Indeed, the State introduced evidence of public statements made by groups seeking to exert "publicity and coercion" on those involved in helping states perform executions.

Flynt's stated rationale for asking for public access to the information was to discover whether M3 was indeed board certified and properly licensed. The district court found that revealing this licensure information to the public would professionally harm and interfere with the privacy rights of M3 and M2, and likely would thwart the State's administration of the death penalty. The district court did not abuse its discretion in finding that the balance of interests here lies in favor of both the execution team members' rights to privacy, and the State's right to carry out its executions. Cf. IDT, 709 F.3d at 1224 (denying public interest group's motion to unseal a civil antitrust complaint involving patented technologies because the possible harm in unsealing outweighed the public interest group's generalized interest in the complaint); Webster Groves, 898 F.2d at 1377 (holding that news organization's interest in unsealing the district court's file in a case between a public school district and a fourteen-year-old disabled student was clearly "outweighed by [the student's] privacy interest and the state's interest in protecting minors").

Contrary to Flynt's arguments on appeal, the district court did not misapply this test by describing *Flynt's* stated purpose for seeking the information, as opposed to the general public's right of access. While the district court indicated Flynt was the party seeking the information, the balancing test it performed considered the public's right to access versus the State's right to keep the information private. The district court did not abuse its discretion in finding that Flynt's request, on behalf of the public, would ultimately lead to uncovering the identity of the medical execution team members and result in harm to the individuals and the State. Accordingly, based upon the balancing test set forth in Nixon and applied in IDT and Webster Groves, the district court did not abuse its discretion in deciding that the documents should remain sealed.

The district court also determined, consistent with our IDT opinion, whether the documents in question could be unsealed but redacted to keep the sensitive identifying information confidential. 709 F.3d at 1224-25. After conducting an *in*

*camera* review, the district court determined that redaction would not be possible, because there was no way to redact M3 and M2's depositions or licensing information in a way that would preserve M3 and M2's identities. This determination was not an abuse of the district court's discretion.

### B. First Amendment

Flynt also argued for public access to the judicial records in question based upon the First Amendment. In <u>IDT</u>, we rejected the plaintiff's arguments for a right of access based on the First Amendment, noting, "[t]his circuit has not decided whether there is a First Amendment right of public access to the court file in civil proceedings." <u>Id.</u> at 1224 n.\*. However we noted in <u>IDT</u> that to the extent there was a First Amendment right of access, it would depend upon two prerequisites: "(1) a historical tradition of accessibility, and (2) a significant positive role for public access in the functioning of the judicial process in question." <u>Id</u>; <u>See</u> <u>Press-Enterprise Co. v. Superior Court of Cal., Cnty. of Riverside</u>, 478 U.S. 1, 9-10 (1986) (setting forth what is now commonly referred to as the "experience and logic" test for First Amendment access to judicial records).

Flynt cannot meet the First Amendment test in this case, as evidenced by our en banc holding in <u>Zink v. Lombardi</u>, 783 F.3d 1089 (8th Cir. 2015) (en banc) (per curiam). In <u>Zink</u>, the prisoners sought information from the State regarding the suppliers of compounded drugs to be used in Missouri executions. The prisoners argued that concealing information about the suppliers violated their right of access to records associated with governmental execution proceedings and constituted an impermissible content-based restriction on access to information. The prisoners asserted a right to the information based upon the First Amendment and the <u>Press-Enterprise</u> test. We noted that the public enjoys a qualified right of access to certain criminal proceedings, preliminary hearings, criminal trials, voir dire, and search warrant applications. <u>Id.</u> at 1112. However, we noted "we have not ruled that an

execution constitutes the kind of criminal proceeding to which the public enjoys a qualified right of access under the First Amendment." Id. Nonetheless, we then "[a]ssum[ed] for the sake of analysis," that the Press-Enterprise analysis applied to executions, and found that information about the identities of drug suppliers had no tradition of accessibility. Id. at 1113. We further noted that we had "reserved judgment about whether even an execution itself must be made public." Id. at 1112. Because "the prisoners ha[d] not alleged facts or cited authority establishing that the particulars of execution methods have 'historically been open to the press and general public,'" they could not prevail under the Press-Enterprise test. Id. (quoting Press-Enterprise, 478 U.S. at 8).

With regard to the second prong of Press-Enterprise, we found that the complaint did not plausibly allege that "public access to detailed information about execution protocols plays a significant positive role in the functioning of the process in question, given that the practical effect of public disclosure would likely be frustration of the State's ability to carry out lawful sentences." Id. at 1113. Cf. In re Mo. Dep't of Corrs., 839 F.3d 732, 736-37 (8th Cir. 2016) (holding that disclosure of "M7"–the lethal injection drug supplier–would unduly burden the State of Missouri's ability to carry out its lawful executions); In re Lombardi, 741 F.3d 888, 896-97 (8th Cir. 2014) (en banc) (granting a writ of mandamus to prevent a district court from disclosing the identity of a Missouri execution team member because disclosing the identity would "prevent the State from acquiring lethal chemicals necessary to carry out the death penalty"). Thus, in several related litigations involving the Missouri execution protocol, we have found that any actions leading to the disclosure of members of the execution team would compromise the State's ability to carry out its lawful sentences. Similarly, public access to the documents in the instant case would not play a significant positive role in the function of Missouri's execution protocol; it would effectively eviscerate the State's ability to carry out executions by jeopardizing its ability to have medical professionals on the execution team. Because

Flynt cannot meet either prong of the <u>Press-Enterprise</u> test, he has not established a First Amendment right to unseal the information that he seeks.

## C. *In Camera* Review

Flynt's final contention is that the district court erred in denying his motion to review the State's *in camera* supplemental briefing. In accordance with our <u>IDT</u> opinion, in November 2015, the district court directed the State to submit supplemental briefing to explain "how the continued sealing of [certain] already-redacted documents is narrowly tailored to promote [the State's] legitimate interests, and (relatedly) how unsealing them will cause the harms [the State] suggest[s] justifies keeping them sealed." In response, the State asked for permission to file a redacted response in the public file, and a full non-redacted explanation to the court for *in camera* review. The district court granted permission for the State to submit its full explanation for the court to review *in camera*. In April 2016, Flynt apparently discovered that the State had filed the supplemental brief under seal with the district court and that counsel had not been permitted to view the supplemental brief. Flynt moved to review this supplemental briefing. The district court denied this motion as untimely, noting that it ruled in December 2015 that the document would be filed under seal for *in camera* review and that any objection to that order should have been filed sooner than four months after the ruling. Alternatively, the court found that *in camera* review was, in any event, the appropriate vehicle for the court to view the supplemental briefing, as any other method would have exposed identifying information about the identity of M3 and M2.

We review this decision for an abuse of discretion, <u>Nixon</u>, 435 U.S. at 599, and find none. First, we agree with the district court that Flynt did not object in a timely manner, which could have given the district court the opportunity to consider an alternative way of handling the matter. Second, we agree that *in camera* review was the best way to accomplish the district court's mandate to consider whether redaction

was possibly a less restrictive means (than sealing in the entirety) of protecting the information. At the bottom line, this dispute is about the identity of medical members of the execution team. Flynt's stated rationale for wanting this information–to check the professional credentials of these members–is in direct and perilous conflict with the State's superior rationale of protecting the identity of these parties. The district court thus did not abuse its discretion in electing to review the supplemental briefing *in camera*, and denying Flynt's subsequent request to review it.

## III. CONCLUSION

Accordingly, we affirm the district court.

KELLY, Circuit Judge, concurring.

Given the en banc opinion in Zink, 783 F.3d at 1111–13, I concur in the court's opinion.[3] As the court notes, quoting Zink, "we have not ruled that an execution constitutes the kind of criminal proceeding to which the public enjoys a qualified right of access under the First Amendment." But in that case, we proceeded to

---

[3]I also concur in the court's determination that the procedure the district court followed for assessing the possibility of redaction was permissible, but I question whether Flynt "did not object in a timely manner." According to the district court, the defendants "ask[ed] for permission to either (1) participate in an *ex parte* and *in camera* hearing or (2) file a redacted explanation in the public file, and provide a non-redacted explanation to the [c]ourt for *in camera* review." The district court "opt[ed] for the latter course" and ordered the filing of supplemental briefing. Given the two options presented, it is not clear that the district court's order allowing the filing of a supplemental brief for "*in camera* review" put Flynt on notice that he—as opposed to the general public—would not have access to the filing. Nevertheless, I see no prejudice to Flynt as a result of any failure of notice, and therefore concur in affirming the district court's denial of Flynt's request to review the supplemental briefing.

assume for the sake of analysis that <u>Press-Enterprise</u> applied to executions, and concluded the prisoners in that case failed "to state a claim for a qualified right of public access."  783 F.3d at 1112.

Under <u>Press-Enterprise</u>, a right of public access attaches if (1) "the place and process have historically been open to the press and general public," and (2) "public access plays a significant positive role in the functioning of the particular process in question." 478 U.S. at 8–9.  In <u>Zink</u>, the court reasoned—under the first prong of the <u>Press-Enterprise</u> test—that there is no "qualified right of public access to information regarding the source of the compounded pentobarbital" because there was no "history of openness to the general public."  783 F.3d at 1112–13 ("[T]he prisoners have not alleged facts or cited authority establishing that the particulars of execution methods have historically been open to the press and general public." (quotation omitted)).  But there is authority that executions have, historically, been carried out in the public eye and their methods and means have been discussed in the public sphere.  <u>See</u> John D. Bessler, <u>Televised Executions and the Constitution:  Recognizing a First Amendment Right of Access to State Executions</u>, 45 Fed. Com. L.J. 355, 359–360 (1993); <u>cf.</u> <u>Cal. First Amend. Coal. v. Woodford</u>, 299 F.3d 868, 875–76 (9th Cir. 2002) ("When executions were moved out of the public fora and into prisons, the states implemented procedures that ensured executions would remain open to some public scrutiny. . . . Thus, there is a tradition of at least limited public access to executions.").  Were this issue before the court in the first instance, I believe there would be support for the conclusion that the historical prong of the <u>Press-Enterprise</u> test is satisfied in this context.

Turning to the second <u>Press-Enterprise</u> prong, in <u>Zink</u>, the court noted that the complaint did not allege that "public access to detailed information about execution protocols plays a significant positive role in the functioning of the process in question, given that the practical effect of public disclosure would likely be frustration of the State's ability to carry out lawful sentences." 783 F.3d at 1113.  The

-11-

court here similarly states, "public access to the documents in the instant case would not play a significant positive role in the function of Missouri's execution protocol; it would effectively eviscerate the State's ability to carry out executions by jeopardizing its ability to have medical professionals on the execution team." And, indeed, Press-Enterprise did recognize that "there are some kinds of government operations that would be totally frustrated if conducted openly," such as grand jury proceedings, the secrecy of which are vital to the criminal justice system itself. 478 U.S. at 9. But, in my view, the methods and means of carrying out of a criminal sentence—a sentence already made public through a trial accessible to the public—do not fall in that category. In Press-Enterprise the Court held that public access to a pre-trial preliminary hearing in a criminal case played a "significant positive role," reasoning that: "Criminal acts, especially certain violent crimes, provoke public concern, outrage, and hostility. When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions." Id. at 13 (quotation omitted). "Openness . . . enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." Id. (quotation omitted). It is difficult to envision an aspect of the criminal justice system where the benefits of public engagement, public awareness, and public confidence are more clear than where the state is attempting to enforce the ultimate penalty of death.[4]

---

[4]If a qualified First Amendment right were to extend to the procedures involved in enforcing a death sentence, it would still be necessary to determine, in this case, whether the sealing of the documents at issue is nonetheless "essential to preserve higher values and is narrowly tailored to serve that interest." Id. at 9–10, 13–14.

-12-