# United States Court of Appeals
## For the Eighth Circuit

———————————————————

No. 21-2632

———————————————————

Courthouse News Service

*Plaintiff - Appellant*

v.

Joan M. Gilmer, in her official capacity as the Clerk of the Circuit Court of St. Louis County, Missouri; Kathy Lloyd, in her official capacity as State Courts Administrator for the Missouri Office of State Courts Administrator

*Defendants - Appellees*

————————————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

————————————

Submitted: April 14, 2022
Filed: September 19, 2022

————————————

Before SHEPHERD, ERICKSON, and STRAS, Circuit Judges.

————————————

STRAS, Circuit Judge.

This case presents two questions. First, does sovereign immunity protect state-court officials who run an e-filing system that delays public access to newly filed civil petitions? Second, should federal courts abstain from hearing this type of

case anyway?  We conclude that the answer to both questions is no, so we reverse and remand for further proceedings.

I.

Courthouse News is a national "news service that reports on civil litigation in state and federal courts throughout the country." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 322 (4th Cir. 2021).  For years, it has published staff-written summaries on newly filed complaints (called "petitions" in Missouri).  In St. Louis County, access used to be easy.  Reporters could go to a bin at the intake counter in the clerk's office and review them.

When Missouri switched to an e-filing system, same-day access became the exception, not the rule.  Newly filed petitions remain unavailable until court staff processes them, which can sometimes take "a week or more."  According to Courthouse News, only five percent of petitions are now available on the day of filing.

Courthouse News wants same-day access again.  It made its views known in a letter to Joan Gilmer, the Circuit Clerk for St. Louis County, and Kathy Lloyd, the Missouri State Courts Administrator.  But Lloyd denied the request because the new system does not have "the ability . . . to give access to new cases filed prior to clerk acceptance."

Now Courthouse News has sued them both in federal court.  It alleges in its complaint that the delays violate the First Amendment.  *See Flynt v. Lombardi*, 885 F.3d 508, 512 (8th Cir. 2018) (discussing the First Amendment right-of-public-access theory).  And it seeks declaratory and injunctive relief to remedy the injury.

In their motion to dismiss, Gilmer and Lloyd asked the district court to either abstain under *Younger v. Harris*, 401 U.S. 37 (1971), or rule that Courthouse News's complaint failed to state a First Amendment claim.  The district court decided to

abstain and never ruled on the merits. Our focus is the same, except Gilmer and Lloyd have raised one new jurisdictional issue that we have to address first: sovereign immunity. *See Edelman v. Jordan*, 415 U.S. 651, 677–78 (1975) (explaining that appellate courts must decide whether state sovereign immunity exists even if the argument was never "raised in the trial court").

## II.

Under the doctrine of sovereign immunity, "[s]tates are immune from suit." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021). One "narrow exception," however, is "grounded in traditional equity practice": "preventing state executive officials from enforcing state laws that are contrary to federal law." *Id.* (discussing the *Ex parte Young* exception). It "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law," the state is no longer the real "party in interest." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (citations omitted). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* (brackets and quotation marks omitted).

Analyzing the issue de novo, *see Fryberger v. Univ. of Ark.*, 889 F.3d 471, 473 (8th Cir. 2018), we conclude this case checks all the *Ex parte Young* boxes. Courthouse News alleges that the delays give rise to ongoing violations of the First Amendment.[1] And it seeks only prospective relief, not damages: declaratory and

---

[1]Although there is reason to believe that the First Amendment may require access to court-filed documents, there is reason to doubt that it must be lightning fast. *Cf. IDT Corp. v. eBay*, 709 F.3d 1220, 1224–25 (8th Cir. 2013) ("Whatever the evolution of the federal common-law right of access, APLC has not established a strong historical tradition of public access to complaints in civil cases that are settled without adjudication on the merits."); *In re Reps. Comm. for Freedom of the Press*,

injunctive relief from two state officials who have a "connection" to the e-filing system. *Reprod. Health Servs. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005); *see also Mahn v. Jefferson Cnty.*, 891 F.3d 1093, 1099 (8th Cir. 2018) (concluding that *Ex parte Young* permitted an official-capacity suit against a Missouri state-court clerk by an ex-employee seeking reinstatement).

There is one wrinkle, though. Neither Gilmer nor Lloyd is an executive official. *See Jackson*, 142 S. Ct. at 532. Rather, under Missouri law, the offices they hold lie squarely within the judicial branch.[2] And *Ex parte Young* suggests a special rule applies to courts. 209 U.S. 123, 163 (1908). It states, for example, that "the right to enjoin . . . a state official . . . does not include the power to restrain a court from acting in any case brought before it" and that "an injunction against a state court would be a violation of the whole scheme of our [g]overnment." *Id.*

---

773 F.2d 1325, 1333–36 (D.C. Cir. 1985) (Scalia, J.) (suggesting that the right to public access to judicial records "is not absolute," especially in "private civil actions"). *But see Courthouse News Serv. v. Planet*, 947 F.3d 581, 600 (9th Cir. 2020) ("The First Amendment secures a right of timely access to publicly available civil complaints that arises before any judicial action upon them."). Still, we decline to decide the merits here for two reasons. First, the district court never reached them. *See Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 780 (8th Cir. 2019) (remanding on a constitutional issue the district court never decided). And second, Courthouse News has not briefed them. *See CRST Expedited, Inc. v. TransAm Trucking, Inc.*, 960 F.3d 499, 508 (8th Cir. 2020) (declining to reach an issue that the parties did not brief); *Henley v. Brown*, 686 F.3d 634, 643–44 (8th Cir. 2012) (same).

[2]The office of circuit clerk was created by state statute, Mo. Rev. Stat. § 483.015.2–.3, and the circuit and associate circuit judges in St. Louis County appointed Gilmer, St. Louis Cnty. Charter art. IV, § 4.430. The office of "state courts administrator" is provided for in article V, § 4 of the Missouri Constitution and discussed in Supreme Court Rule 82.03, which states that she is in charge of "the administrative methods and systems adopted by th[e] [Missouri Supreme] Court for use in the office of the clerks and the various state and municipal courts."

Those same statements came into play nearly a century later in *Jackson*. The question there was whether a federal court could enjoin state-court clerks from docketing abortion cases under Texas's Heartbeat Abortion Ban. 142 S. Ct. at 532. In answering no, the Supreme Court made clear that *Ex parte Young*'s no-injunctions rule extended to other state-court officials too. *See id.* Gilmer and Lloyd's position is that the same goes for them.

The problem is that *Ex parte Young* had a particular type of injunction in mind: one that would "restrain a [state] court from acting" or from "exercis[ing] jurisdiction" in a case. 209 U.S. at 163. The injunction here, even if Courthouse News is ultimately successful, will not prevent *any* Missouri court from "acting" or "exercis[ing] jurisdiction" in *any* case. *Id.* All it will do is require Gilmer to release newly filed petitions earlier than she might otherwise have. That is not the type of relief that will upset "the whole scheme of . . . [g]overnment." *Id.*

Nothing in *Jackson* is to the contrary. In describing how the *Ex parte Young* exception works in cases seeking relief against a state-court official, the Supreme Court used important qualifiers. Far from laying out an absolute rule, the Court said that it "does not *normally* permit federal courts to issue injunctions against state-court judges or clerks" because "*[u]sually*, those individuals do not enforce state laws as executive officials might; instead, they work to resolve disputes between parties." *Jackson*, 142 S. Ct. at 532 (emphases added). The rule, in other words, has not changed over the last century: state sovereign immunity shields state-court judges and clerks from prospective relief that will interfere with their ability to "act[]" in any case." *Ex parte Young*, 209 U.S. at 163. And a lawsuit aimed at *preventing* state-court clerks from docketing abortion cases is a case in point. *Jackson*, 142 S. Ct. at 532.

This case, by contrast, is more like a classic *Ex parte Young* suit brought against an executive official. Courthouse News is asking a federal court to order Gilmer and Lloyd to carry out their "administrative dut[ies]" differently. *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1131–32 (8th Cir. 2019) (stating that

-5-

"clerk[s] of court" who engage in "supervisory and administrative duties" are subject to suit under *Ex parte Young*). So this lawsuit is about "enjoin[ing] named defendants from taking specified unlawful actions," *Jackson*, 142 S. Ct. at 535, not "enjoin[ing] courts from proceeding in their own way to exercise jurisdiction," *Ex parte Young*, 209 U.S. at 163.

Looking deeper into *Jackson*'s reasoning reveals two other meaningful differences. First, the "traditional remedy" if a "state court errs" is "some form of appeal . . . not the entry of an *ex ante* injunction preventing the state court from hearing cases." *Jackson*, 142 S. Ct. at 532. Missouri's implementation of its e-filing system is not the type of decision that gets appealed, at least not in the usual way.

Second, the adversity between the parties that was missing in *Jackson* is present here. *Id.* ("Clerks serve to file cases as they arrive, not to participate as adversaries in those disputes."). Courthouse News complains about delays in the e-filing system, not the merits of any underlying lawsuit. On that point, Courthouse News is adverse to Gilmer and Lloyd: Courthouse News wants them to make newly filed petitions available more quickly and they just want to follow existing procedures, which involve making petitions available once court staff has processed them.

We understand that this lawsuit toes a fine line between directly interfering with state-court operations and potentially vindicating a litigant's constitutional rights. It also places the district court in the uncomfortable position of conceivably telling Missouri courts how to implement their own e-filing system. Although we are "wary of approving new encroachments on sovereignty," we conclude that, whatever may stand in the way of Courthouse News's lawsuit, sovereign immunity is not it. *Stewart*, 563 U.S. at 258 (explaining that "not every offense to the dignity of a [s]tate constitutes a denial of sovereign immunity").

III.

Gilmer and Lloyd have another idea: abstention. "[W]here the relief being sought is equitable in nature or otherwise discretionary," federal courts can stay an action, dismiss it, or remand to state court "based on abstention principles." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 721 (1996). Even though the district court acknowledged that *Younger* abstention is not a "perfect fit[]," it decided to abstain anyway. *See Younger v. Harris*, 401 U.S. 37 (1971). We review this decision for an abuse of discretion, subject to the caveat that any underlying legal issues, including whether *Younger* applies, receive plenary review. *See Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 878 (8th Cir. 2002). The same goes for any decision to grant or deny equitable relief. *See Gumbhir v. Curators of the Univ. of Mo.*, 157 F.3d 1141, 1144 (8th Cir. 1998).

A.

Federal courts have a "virtually unflagging" obligation to hear and decide cases within their jurisdiction. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013). As Chief Justice Marshall colorfully put it, to "decline the exercise of jurisdiction" is tantamount to "treason to the [C]onstitution." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

Over time, however, the Supreme Court has recognized exceptions to what was once a rigid rule. Among them are various abstention doctrines, including what we now call *Younger* abstention. As the Supreme Court describes it, *Younger* "espouse[d] a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982).

*Younger* comes with important limits. One is that it applies only when there is a "parallel, pending state . . . proceeding[]." *See Sprint Commc'ns*, 571 U.S. at 72. The second is that only three types of state "parallel" proceedings count: "(1) a

criminal prosecution, (2) a civil enforcement proceeding that is akin to a criminal prosecution, [and] (3) a proceeding implicating a state's interest in enforcing the orders and judgments of its courts." *Minn. Living Assistance, Inc. v. Peterson*, 899 F.3d 548, 552 (8th Cir. 2018). Only then are the "exceptional circumstances" justifying *Younger* abstention potentially present. *See Sprint Commc'ns*, 571 U.S. at 82 ("*Younger* extends to the[se] *three* 'exceptional circumstances' . . . but no further" (emphasis added)); *see also Peterson*, 899 F.3d at 552 (discussing the other requirements of *Younger* abstention).

Gilmer and Lloyd cannot point to any "parallel, pending state . . . proceeding," much less one that falls within one of *Younger*'s three categories. *Sprint Commc'ns*, 571 U.S. at 72, 82. Nor does this case resemble the classic *Younger* situation: a litigant runs to federal court to cut off an impending or actual state-court proceeding that is unlikely to go well. *See, e.g.*, *Younger*, 401 U.S. at 38–39 (involving a federal suit seeking to enjoin the city attorney from bringing a state-level prosecution); *Hicks v. Miranda*, 422 U.S. 332, 334–38 (1975) (suing in federal court to block a state obscenity prosecution); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 598 (1975) (attempting to get declaratory relief in federal court after losing a nuisance suit in state court). Here, all we have is a dispute about who gets to see newly filed petitions and when, and neither is the subject of any pending state-court proceeding.

## B.

Yet, according to Gilmer and Lloyd, even the mere *threat* of interference with state proceedings is enough. They point to *O'Shea v. Littleton*, which addressed whether a federal court could step in to prevent racial discrimination in bond-setting, sentencing, and jury procedures in a municipal-court system. 414 U.S. 488, 491–92 (1974). After holding that the controversy was not yet ripe, the Supreme Court went on to suggest it may well have ruled the same way under *Younger*. *Id.* at 500. In its view, the case presented the type of "ongoing federal audit of state criminal

proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris* and related cases sought to prevent." *Id.* (citation omitted).

Even reading this line from *O'Shea* for all it is worth does not bring this case within *Younger*'s domain. The requested remedy there was "aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials," meaning that it "contemplate[d] interruption of state proceedings to adjudicate assertions of noncompliance by petitioners." *Id.* Here, by contrast, there is no risk that a decision in Courthouse News's favor would interrupt any state-court proceeding, despite the significant administrative burden it might place on court staff.

Even though abstention does not apply, these cases still suggest that there are limits to the type of equitable relief available. As the Supreme Court explained in *Rizzo v. Goode*, "appropriate consideration must be given to principles of federalism in determining the availability *and* scope of injunctive relief." 423 U.S. 362, 379 (1976) (emphasis added). Gilmer and Lloyd underscore this point in their brief.

*Rizzo* involved a broad structural injunction that required various city officials "to submit to [the district court] for its approval a comprehensive program for improving the handling of citizen complaints alleging police misconduct." *Id.* at 365. The dispute arose out of a history of racially motivated police brutality, and the district court issued an order that would have allowed it to "supervise the functioning of the police department." *Id.* at 365, 373, 380. The Supreme Court concluded that the district court had exceeded its authority because the injunction was an "unwarranted intrusion . . . into the discretionary authority committed to [city officials] by state and local law." *Id.* at 366; *see also Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring) (explaining how overbroad injunctions can override the "[s]tate's discretionary authority over its own program[s] and budgets and forc[e] state officials to reallocate state resources and funds . . . at the expense of other citizens, other government programs, and other institutions not represented in court").

Just like in *Rizzo*, there are "important considerations of federalism" that "weigh[]" against an injunction here. 423 U.S. at 378. A consistent theme in all the cases we have discussed is a concern about excessive interference by federal courts in state-court business. If Courthouse News eventually prevails on its constitutional claim, declaratory relief would mitigate this concern to some degree by giving Missouri courts "the widest latitude in the 'dispatch of [their] own internal affairs.'" *Id.* at 378–79 (quoting *Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 896 (1961)). As long as there is continuing attention given to these "delicate issues of federal-state relationships," the case can move forward. *Id.* at 380 (quoting *Mayor v. Educ. Equal. League*, 415 U.S. 605, 615 (1974)).

IV.

We accordingly reverse the judgment of the district court and remand for further proceedings.

_____