# United States Court of Appeals

### For the Eighth Circuit

_____

## No. 14-1549

_____

Fort Yates Public School District #4

*Plaintiff - Appellant*

v.

Jamie Murphy, for C.M.B. (a minor); Standing Rock Sioux Tribal Court

*Defendants - Appellees*

_____

## No. 14-1702

_____

Fort Yates Public School District #4

*Plaintiff - Appellee*

v.

Jamie Murphy, for C.M.B. (a minor)

*Defendant - Appellant*

Standing Rock Sioux Tribal Court

*Defendant*

_____

Appeals from United States District Court
for the District of North Dakota - Bismarck

Submitted: December 10, 2014
Filed: May 15, 2015

Before BYE, SMITH, and KELLY, Circuit Judges.

SMITH, Circuit Judge.

Plaintiff-Appellant Fort Yates Public School District #4 ("School District") brought an action against Defendant-Appellees "Jamie Murphy for C.M.B. (a minor)" and the Standing Rock Sioux Tribal Court ("Tribal Court"), seeking (1) a declaration that the Tribal Court lacks jurisdiction over claims that Murphy filed against the School District in Tribal Court, and (2) injunctions prohibiting the prosecution of the claims in Tribal Court. The district court dismissed the Tribal Court on sovereign immunity grounds. Later, the district court dismissed the entire case on the grounds that the Tribal Court had jurisdiction. For the reasons stated herein, we affirm in part and reverse in part.

## I. *Background*

The School District is a political subdivision of the State of North Dakota, *Bismarck Public School District #1 v. State By and Through North Dakota Legislative Assembly*, 511 N.W.2d 247, 251 (N.D. 1994), that operates within the exterior boundaries of the Standing Rock Indian Reservation ("Reservation"). The Constitution of North Dakota requires that the School District provide education to all children in the State of North Dakota, including children who are Indians or reside on reservations. N.D. Const. art. VIII, § 1 ("[P]ublic schools [ ] shall be open to all children of the state of North Dakota . . . .").

In 2003, the School District and the Standing Rock Sioux Tribe ("Tribe") entered into a Joint Powers Agreement ("Agreement") to "combine the educational, social, cultural and physical opportunities of all K-12 students" who attend schools on the Reservation regardless of Indian heritage.[1] The Agreement provided that both the Standing Rock Community School Board and the Fort Yates School Board would govern the school system. It also provided that all "real property or equipment" purchased under the Agreement would generally be "joint property" of the Tribe and School District.[2] The Agreement made clear that "[e]ach of the parties recognize[s] the sovereignty of the other. In executing the Agreement, no party waive[s] any rights, including treaty rights, immunities, including sovereign immunities, or jurisdiction. This Agreement neither diminishes nor expands rights or protections afforded other persons or entities under tribal, state or federal law."

A fight between C.M.B. and A.K., two students at a school subject to the Agreement, triggered the dispute at the heart of this litigation. After the altercation, the school suspended A.K. for ten days, and C.M.B. obtained a restraining order against A.K. A.K. allegedly violated the restraining order several months later by verbally harassing C.M.B. at the school. In response, the school suspended A.K. for ten additional days.

Jamie Murphy filed suit on behalf of her daughter, C.M.B., a Tribe member, in the Tribal Court against the School District, alleging a breach of its duty to provide a safe learning environment, negligent hiring and training, failure to respect a Tribal

---

[1]The Governor of North Dakota approved the Agreement but was not a party to it.

[2]It is unclear in the record what, if any, of the real property and facilities used by the school system belong to the Tribe. It appears that at least some of the property is not Tribal property given in part the Agreement's provision for "joint property," as well as the Agreement's specification that the School District operated a "distinct and separate" school system on the Reservation before 2003.

Court order, and failure to restrain a known violent student. The School District moved to dismiss the action on the grounds that the Tribal Court lacked jurisdiction over the School District. The Tribal Court denied the motion, concluding that it had jurisdiction.

The School District did not appeal the Tribal Court's decision to the Standing Rock Supreme Court; instead, it filed the instant suit in federal court against "Jamie Murphy for C.M.B. (a minor)" (the named party pursuing the Tribal Court action) and the Tribal Court, seeking (1) a declaration that the Tribal Court lacks jurisdiction to decide Murphy's claims, and (2) an injunction prohibiting prosecution of the claims before the Tribal Court. The district court granted a temporary restraining order prohibiting Murphy from prosecuting her claims before the Tribal Court. The district court dismissed the Tribal Court from the case, however, finding sua sponte that the Tribal Court had sovereign immunity.

Murphy then moved to dismiss the action on the grounds that "she [was] not an appropriate party to this action on an individual basis, nor can she appear on behalf of C.M.B. . . . as C.M.B. is no longer a minor and was an adult at the time this action was initiated." The case was thereafter reassigned to a new judge. Upon review, the district court concluded that the Tribal Court did have jurisdiction to resolve Murphy's suit against the school district and dismissed and remanded the case to the Tribal Court. In finding that jurisdiction lay with the Tribal Court, the district court found inapplicable the United States Supreme Court's decision in *Montana v. United States*, 450 U.S. 544 (1981). The court further concluded that, even if *Montana* were applicable, the Tribal Court would nevertheless have jurisdiction because the School District entered into the Agreement with the Tribe. Because the court dismissed the case on these grounds, it also dismissed Murphy's motion to dismiss as moot.

II. *Discussion*

A. *Tribal Court Jurisdiction*

The School District argues on appeal that the district court erred in finding that the Tribal Court had jurisdiction over Murphy's claims. "The extent of tribal court subject matter jurisdiction over claims against nonmembers of the Tribe is a question of federal law which we review de novo." *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 934 (8th Cir. 2010) (citation omitted).

No federal statute or treaty specifically provides the Tribal Court with jurisdiction over the claims at issue in this case; therefore, the Tribal Court's jurisdiction must stem from its "retained or inherent sovereignty." *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 649–50 (2001). We analyze the contours of a tribal court's inherent jurisdiction over nonmembers of the tribe within the framework and principles set forth in *Montana*, which remains the "'pathmarking case'" on the subject. *Nevada v. Hicks*, 533 U.S. 353, 358 (2001) (quoting *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997)). In *Montana*, the Supreme Court addressed whether a tribe could prohibit hunting and fishing activities by non-Indians on reservation land owned in fee simple by non-Indians. As a general matter, the Court held, "the inherent sovereign powers of an Indian tribe *do not* extend to the activities of *non*members of the tribe." 450 U.S. at 565 (emphases added). The Court then noted, however, two relatively narrow exceptions to this general rule:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, *the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements*. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that

*conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.*

*Id.* at 565–66 (emphases added) (internal citations omitted).[3] Indian tribes may regulate these two categories of nonmember conduct (that is, activities of nonmembers who enter into consensual relationships with the tribe or activities that threaten the tribe), which are referred to as the "*Montana* exceptions." The Court in *Montana* ultimately found that neither exception provided the Tribe with jurisdiction over non-Indians' hunting and fishing on non-Indian land. *Id.* at 566.

Given the general rule set forth and applied in *Montana*—that a tribe's inherent sovereign powers do not vest it with jurisdiction over the activities of nonmembers—the Tribal Court presumably does not have jurisdiction over the claims asserted in this case. "The burden rests on the tribe" members to establish that one of the *Montana* exceptions applies. *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 330 (2008).

### 1. *First* Montana *Exception*

The School District entered into the Agreement with the Tribe to provide administrative and educational services for students, both Indian and non-Indian, residing on the Reservation. Although it is a consensual arrangement, this Agreement, alone, does not confer jurisdiction on the Tribal Court under the first *Montana* exception because North Dakota law restricts state school districts' contractual authority. North Dakota law specifies that a school district *cannot* "[a]uthorize an agreement that enlarges or diminishes the jurisdiction over civil or criminal matters

---

[3]The Tribal Court's jurisdiction cannot exceed the Tribe's regulatory power. *See Strate,* 520 U.S. at 453 (1997) ("As to nonmembers, we hold, a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction."); *Attorney's Process*, 609 F.3d at 936 (tribal court jurisdiction "turns upon whether the actions at issue in the litigation are regulable by the tribe") (quoting *Hicks*, 533 U.S. at 367 n.8).

that may be exercised by . . . tribal governments located in North Dakota." N.D. Cent. Code § 54–40.2–08. The agreements evince nothing indicating that the School District intended to, or represented that it could, deviate from that law and affirmatively subject itself to Tribal Court jurisdiction for the types of claims asserted in this case. To the contrary, the Agreement specifies, among other things, that "[e]ach of the parties recognize[s] the sovereignty of the other" and that the parties retained their respective "immunities" and "rights."[4]

Moreover, even assuming arguendo that the School District *could* agree to an expansion of Tribal Court jurisdiction under North Dakota law, the first *Montana* exception still would not provide the Tribal Court with jurisdiction in this case. Indeed, in *Hicks,* the Supreme Court elaborated on the first *Montana* exception and specified that, "[r]ead in context, an 'other arrangement' is clearly another *private consensual* relationship . . . ." 533 U.S. at 359 n.3 (holding that a tribal court lacked jurisdiction over claims asserted against state officials who executed a search warrant on tribal land to search for evidence of an off-reservation crime). To resolve lingering ambiguities as to what constitutes an "other arrangement" under the first *Montana* exception, the Court further stated that:

> The [*Montana*] Court (this is an opinion, bear in mind, not a statute) *obviously did not have in mind States or state officers acting in their governmental capacity; it was referring to private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction* by the arrangements that they (or their employers) entered into. This is confirmed by the fact that all four of the cases in the immediately

_____

[4]The agreement also provides that "no party waive[s] any . . . jurisdiction." We think the most natural reading of this provision in the context of the Agreement is that the parties did not waive any rights to contest personal jurisdiction solely by virtue the Agreement. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (noting that "the personal jurisdiction requirement is a waivable right").

following citation involved private commercial actors. *See* [*Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 152 (1980)] (nonmember purchasers of cigarettes from tribal outlet); [*Williams v. Lee*, 358 U.S. 217 (1959)] (general store on the Navajo reservation); [*Morris v. Hitchcock*, 194 U.S. 384 (1904)] (ranchers grazing livestock and horses on Indian lands "under contracts with individual members of said tribes"); *Buster v. Wright*, 135 F. 947, 950 (8th Cir. 1905) (challenge to the "permit tax" charged by a tribe to nonmembers for "the privilege . . . of trading within the borders").

*Id.* at 372 (emphasis added).

The Tribe members nevertheless contend that the requisite "consensual relationship" existed under the first *Montana* exception because the School District entered into a *contract* with the Tribe (unlike *Hicks*). But they are mistaken. We note that both the Ninth and Tenth Circuits have held that contractual agreements between tribes and government entities do not constitute "consensual relationships" within the meaning of the first *Montana* exception. In *County of Lewis v. Allen*, for instance, the Ninth Circuit issued an en banc decision holding that a tribal court lacked jurisdiction over a tribal member's civil claims against a political subdivision of a state stemming from his arrest on reservation land—even though the arrest was made pursuant to a specific law enforcement contract between the state and the tribe. 163 F.3d 509, 514–16 (9th Cir. 1998). In so holding, the court noted that "*Montana*'s exception for suits arising out of consensual relationships has never been extended to contractual agreements between two government entities . . . . [T]he Agreement between the tribe and the state is not a 'consensual relationship' of the qualifying kind." *Id.* at 515 (quotation marks omitted) (quoting *Strate*, 520 U.S. at 457). Likewise, in *MacArthur v. San Juan County*, the Tenth Circuit held that employment relationships that were "contractual in nature" between a state's political subdivision and two tribe members "were not 'private consensual relationships' . . . and [therefore] do not fall within the first *Montana* exception." 497 F.3d 1057, 1071, 1074 (10th Cir. 2007).

More recently, in *Red Mesa Unified School District v. Yellowhair*, the District of Arizona reached the same conclusion in a case remarkably similar to this case. There, two school districts operating on Indian reservations filed for declaratory and injunctive relief in federal court to prohibit a tribal administrative tribunal from deciding employment-related claims filed against the school districts. No. CV-09-8071-PCT-PGR, 2010 WL 3855183, at *2 (D. Ariz. Sept. 28, 2010). The court granted the relief and specifically found that the first *Montana* exception did not apply—notwithstanding a lease agreement between the school districts and the tribe—because the school districts "made the employment decisions at issue while operating in their governmental capacities pursuant to their state constitutionally-imposed mandate to operate a public school system within the reservation boundaries." *Id.* at *3.

We agree with these well-reasoned decisions. The School District in this case acted in its official capacity and, specifically, in furtherance of its obligations under the Constitution of North Dakota to make public education "open to all children of the state of North Dakota," *see* N.D. Const. art. VIII, § 1, when it entered into the Agreement. The Agreement therefore does not fall within the ambit of the first *Montana* exception.[5]

### 2. *Second* Montana *Exception*

The only remaining avenue for the Tribal Court to have jurisdiction requires that the claims at issue involve "conduct [that] threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. In conducting this analysis, we note at the outset that not every event that impacts a tribe's political integrity, economic security, health, or

---

[5]To be clear, we are not ruling out the possibility that a state and a tribe could enter into an agreement that confers jurisdiction upon the tribe—such as an agreement that expressly provides for such jurisdiction. But no such agreement is at issue in the instant case.

welfare will necessarily give rise to tribal court jurisdiction; indeed, an overly broad reading of the second *Montana* exception would render meaningless *Montana*'s general rule that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* at 565. The Court in *Hicks* emphasized the necessarily narrow scope of the second *Montana* exception when it confirmed that, "[w]here nonmembers are concerned, the 'exercise of tribal power *beyond what is necessary to protect tribal self-government or to control internal relations* is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.'" 533 U.S. at 359 (quoting *Montana*, 450 U.S. at 564); *see also Plains Commerce Bank*, 554 U.S. at 330 (noting that the *Montana* exceptions "are limited ones, and cannot be construed in a manner that would swallow the rule, or severely shrink it") (quotations omitted).

In *Plains Commerce Bank*, the Court further elucidated the circumstances necessary for the second *Montana* exception to apply. There, the Court held that the second *Montana* exception did *not* apply to a non-Indian bank's sale of land on a tribal reservation to another non-Indian because:

> The conduct must do more than injure the tribe, it must "*imperil the subsistence*" of the tribal community. [*Montana*, 450 U.S. at 566]. One commentator has noted that "th[e] elevated threshold for application of the second *Montana* exception suggests that tribal power must be *necessary to avert catastrophic consequences*." Cohen § 4.02[3][c], at 232, n.220.

554 U.S. at 341 (emphases added).[6] The claims and alleged conduct at issue in this case clearly do not "imperil the subsistence" of the Tribe, and Tribal Court jurisdiction is not "necessary to avert catastrophic consequences." In this regard, we note that other courts have found the second *Montana* exception inapplicable to conduct that was either comparable or more detrimental to the Tribe's subsistence and well-being than the conduct alleged in this case.[7]

---

[6]Of course, the transaction at issue in *Plains Commerce Bank* involved land that non-Indians owned in fee simple both before and after the transaction, and this court is aware that "[t]he ownership status of land" is "one factor to consider in determining whether regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.'" *Hicks*, 533 U.S. at 360. As noted above, however, there is scant evidence in the record what land and facilities relevant to this case were owned by the Tribe. Nevertheless, even if the Tribe owned all of the land and facilities relevant to this case—which is not supported by the record—*Montana* would still apply, *see Attorney's Process*, 609 F.3d at 935–41, and our analysis would not change for the reasons stated herein.

[7]*See Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298, 1305 (9th Cir. 2013) (holding that the second *Montana* exception did not apply to non-Indian conduct that allegedly caused, among other things, "groundwater contamination" and "improper disposal of construction debris"); *MacArthur,* 497 F.3d at 1075 (holding that "[w]hile the Navajo Nation undoubtedly has an interest in regulating employment relationships between its members and non-Indian employers on the reservation, that interest is not so substantial in this case as to affect the Nation's right to make its own laws and be governed by them"); *Allen*, 163 F.3d at 515–16 ("Having divested itself of sovereignty over the very activities that gave rise to the civil claim, nothing in this case can be seen as threatening self-government or the political integrity, economic security or health and welfare of the tribe. . . . Indian tribes or their members . . . may pursue their causes of action in state or federal court."); *Otter Tail Power Co. v. Leech Lake Band of Ojibwe*, No. 11-1070 DWF/LIB, 2011 WL 2490820, at *5 (D. Minn. June 22, 2011) (holding that the second *Montana* exception did not apply to nonmember conduct that would interfere with the tribe's "hunting, fishing, and gathering rights"); *Dolgencorp Inc. v. Miss. Band of Choctaw Indians*, 846 F. Supp. 2d 646, 650 (S.D. Miss. 2011), (holding that the second *Montana* exception did not apply to a case in which a nonmember of the tribe

In sum, neither *Montana* exception applies to the facts of this case. We therefore hold that the Tribal Court lacks jurisdiction over Murphy's claims.

## B. *Sovereign Immunity*

The School District contends that the district court erred by dismissing the Tribal Court on sovereign immunity grounds. Tribal sovereign immunity is a "jurisdictional threshold matter." *Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 903 (8th Cir. 1999). "Questions of sovereign immunity are subject to de novo review." *Lors v. Dean*, 746 F.3d 857, 861 (8th Cir. 2014) (citation omitted).

"As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998) (citations omitted). "[A] tribe's sovereign immunity may extend to tribal agencies," including the Tribal Court. *See Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000).

The School District does not contend that Congress has authorized this suit or that the Tribe has waived its sovereign immunity. Instead, the School District argues primarily that "sovereign immunity does not apply in this action" because the School District "is not seeking damages but only declaratory and injunctive relief." The Supreme Court has made clear, however, that a tribe's sovereign immunity bars suits against the tribe for injunctive and declaratory relief. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. —, 134 S. Ct. 2024, 2039 (2014) (holding that a tribe's sovereign immunity barred a suit against the tribe for injunctive relief); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58–59 (1978) (holding that a tribe's sovereign immunity barred a suit against the tribe for declaratory and injunctive relief).[8]

---

allegedly molested a minor tribe member), *aff'd*. F.3d 167 (5th Cir. 2014).

[8]Of course, the Tribe's sovereign immunity does not necessarily protect Tribal officials from suit. *See, e.g.*, *Bay Mills*, 134 S. Ct. at 2035 (2014) ("[The plaintiff]

In light of this precedent, the district court did not err in holding that the Tribe's sovereign immunity bars the School District's suit against the Tribal Court.

## C. *Murphy's Motion to Dismiss*

Murphy argues on appeal that the district court erred in not dismissing all claims against "Jamie Murphy for C.M.B. (a minor)" under Rule 12(b)(7).[9] According to Murphy, C.M.B. was over 18 years old at the time the School District filed this action, meaning "Jamie Murphy for C.M.B. (a minor)" is an improper party. We review the district court's decision to not grant Murphy's 12(b)(7) motion for an abuse of discretion. *See HS Res., Inc. v. Wingate*, 327 F.3d 432, 438 (5th Cir. 2003).

"Federal Rule of Civil Procedure 12(b)(7) permits dismissal of a complaint for failure to join a party under Rule 19," although "courts are generally 'reluctant to grant motions to dismiss of this type.'" *16th & K Hotel, LP v. Commonwealth Land Title Ins. Co.*, 276 F.R.D. 8, 12 (D.D.C. 2011) (quoting 5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1359 (3d ed. 2004)); *see also Askew v. Sheriff of Cook Cnty., Ill.*, 568 F.3d 632, 634 (7th Cir. 2009) ("Dismissal, however, is not the preferred outcome under the Rules."). Broadly speaking, Rule 19 requires the joinder of parties necessary for the fair and complete resolution of the case; when joinder of such a party is not feasible, however, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties

could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction . . . . [T]ribal immunity does not bar such a suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct." (citations omitted)). But, in this case, the School District chose not to name any Tribal officials as defendants.

[9]"Jamie Murphy for C.M.B. (a minor)" is the party who initiated and prosecuted the Tribal Court suit. The School District presumably named her, instead of C.M.B., as the defendant in this action because C.M.B. was never substituted in as the plaintiff in the Tribal Court litigation.

or should be dismissed." Fed. R. Civ. P. 19(b). "Determining whether an entity is an indispensable party is a highly-practical, fact-based endeavor, and [Rule] 19's emphasis on a careful examination of the facts means that a district court will ordinarily be in a better position to make a Rule 19 decision than a circuit court would be." *Hood ex rel. Miss. v. City of Memphis, Tenn.*, 570 F.3d 625, 628 (5th Cir. 2009) (quotation omitted).

The district court dismissed the entire case on jurisdictional grounds, rendering Murphy's Rule 12(b)(7) motion moot. The district court may need to address Murphy's Rule 12(b)(7) motion on remand in light of our decision today, but it did not abuse its discretion in declining to rule on the motion *before* dismissing the case on other grounds. *See, e.g., Vacanti v. Sunset Fin. Servs., Inc.*, No. 8:08CV436, 2009 WL 792387, at *3 (D. Neb. Mar. 23, 2009) (holding that a defendant's motion to dismiss under "Fed. R. Civ. P. 12(b)(7), 19(a) and 9(b) [was] moot" because plaintiff's claims were dismissed on other grounds); *C.W. Limousine Serv., Inc. v. City of Chi.*, No. 96 C 5130, 1997 WL 208439, at *4 n.1 (N.D. Ill. Apr. 21, 1997) (same).

D. *Exhaustion of Tribal Remedies*

The School District opted not to appeal the Tribal Court's jurisdictional determination to the Tribe's Supreme Court. Murphy and the Tribal Court therefore contend on appeal that the School District's action should be barred for failure to exhaust tribal remedies.

Although litigants must generally seek tribal appellate review of lower tribal courts' jurisdictional determinations before seeking review in federal court, *Colombe v. Rosebud Sioux Tribe*, 747 F.3d 1020, 1024 (8th Cir. 2014), that is not always the case. Indeed, the Supreme Court has specified that when a tribal court plainly lacks adjudicatory jurisdiction over an action, "the otherwise applicable exhaustion requirement must give way, for it would serve no purpose other than delay." *Strate*, 520 U.S. at 459 n.14 (citation omitted). In light of our holding that the Tribal Court

lacks jurisdiction, "it would serve no purpose other than delay" to require the School District to appeal the Tribal Court's jurisdictional determination to the Tribe's Supreme Court. The School District was therefore not required to exhaust its administrative remedies before commencing this suit. *See id.*; *Hicks*, 533 U.S. at 369 (holding that because the "tribal courts lack jurisdiction . . . adherence to the tribal exhaustion requirement in such cases 'would serve no purpose other than delay,' and is therefore unnecessary"); *Rolling Frito-Lay Sales LP v. Stover*, No. CV 11-1361-PHX-FJM, 2012 WL 252938, at *5 (D. Ariz. Jan. 26, 2012).

## III. *Conclusion*

For the foregoing reasons, and after thoroughly considering all of the parties' contentions on appeal, we reverse the district court's decision with respect to Tribal Court jurisdiction and remand for further proceedings. We affirm the district court's dismissal of the Tribal Court on sovereign immunity grounds.

———————————————