# United States Court of Appeals
## For the Eighth Circuit

———————————————————

## Nos. 18-1824, 18-1856

———————————————————

Kodiak Oil & Gas (USA) Inc., now known as Whiting Resources Corporation;
HRC Operating, LLC

*Plaintiffs - Appellees*

v.

Jolene Burr; Ted Lone Fight; Georgianna Danks; Edward S. Danks; Mary
Seaworth, in her capacity as the Acting Chief Judge of the Fort Berthold District
Court

*Defendants - Appellants*

------------------------------

EOG Resources, Inc.

*Plaintiff - Appellee*

Jolene Burr; Ted Lone Fight; Georgianna Danks; Edward S. Danks; Mary
Seaworth, in her capacity as the Acting Chief Judge of the Three Affiliated Tribes
District Court of the Fort Berthold Indian Reservation; Charlene Knight, in her
capacity as the Court Clerk/Consultant of the Three Affiliated Tribes District
Court of the Fort Berthold Indian Reservation;

*Defendants - Appellants*

———————————

Appeals from United States District Court
for the District of North Dakota

———————————

Submitted: March 14, 2019
Filed: August 5, 2019

_____

Before GRUENDER, BENTON, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

A dispute over the practice of flaring natural gas from oil wells fuels the legal controversy in this case: the scope of Native American tribal court authority over non-members. Several members of the MHA Nation sued numerous non-tribal oil and gas companies in MHA tribal court. Those companies operate oil wells on lands within the Fort Berthold Indian Reservation that have been allotted to individual tribe members but are held in trust by the federal government. The tribe members alleged the companies owed royalties from wastefully-flared gas. Some of these companies unsuccessfully contested the tribal court's jurisdiction over them in tribal court. Then they initiated this action in federal court to enjoin the tribal court plaintiffs and tribal court judicial officials. The district court[1] issued a preliminary injunction, and the tribal court plaintiffs and officials separately appealed. We affirm the injunction because we conclude suits over oil and gas leases on allotted trust lands are governed by federal law, not tribal law, and the tribal court lacks jurisdiction over the non-member oil and gas companies.

## I. Background

In February 2014, four individual members (the "tribal court plaintiffs") of the MHA (Mandan, Hidatsa, and Arikara) Nation (otherwise known as the Three

_____

[1]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

Affiliated Tribes, residing on the Fort Berthold Indian Reservation) sued numerous oil and gas companies in the Fort Berthold District Court of the MHA Nation. The tribal court plaintiffs, on behalf of a proposed class of similarly situated plaintiffs, alleged they owned mineral rights within the reservation and had entered into oil and gas leases with the defendants. They alleged the defendants were operating wells on the reservation that flared, or burned off, natural gas. Such flaring was improper, they alleged, in part because "[t]echnology and services have been readily available to capture, convert and market the natural gas without pipelines or electricity." The tribal court plaintiffs sought to recover royalties for the flared natural gas.

The form lease executed by the tribal court plaintiffs and the companies was issued by the U.S. Department of the Interior, Bureau of Indian Affairs ("BIA"), and required approval by the BIA. The tribal court plaintiffs relied on a provision of the lease in which the lessee agreed: "To exercise reasonable diligence in drilling and operating wells for oil and gas . . . having due regard for the prevention of waste of oil or gas developed on the land . . . ."

The tribal court defendants moved to dismiss, arguing, among other things, that the court lacked jurisdiction over them. Fort Berthold Special District Court Judge Terry L. Pechota denied the motion. Judge Pechota concluded the tribe could exercise jurisdiction over the defendants because they voluntarily entered into contractual relationships with tribe members. The defendants appealed to the MHA Nation Supreme Court, which asserted that "[f]rom time immemorial, the governing bodies of the MHA Nation exercised inherent sovereignty over all persons who entered the Nation's territory." The court commented that *Montana v. United States*, 450 U.S. 544 (1981), was "[t]he most infamous modern manifestation of the" U.S. Supreme Court's "long legacy of limiting various aspects of tribal sovereignty." The MHA Nation Supreme Court then concluded *Montana* — which generally prohibits the exercise of tribal court jurisdiction over non-members — either did not apply or the case fell under an exception allowing tribal regulation of "the activities of

nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565.

Kodiak Oil & Gas, Inc. and EOG Resources, Inc., two of the tribal court defendants, separately filed suit in federal court against the tribal court plaintiffs and the acting chief judge of the Fort Berthold District Court. EOG Resources also included the court clerk of the Fort Berthold District Court as a defendant. HRC Operating, LLC, later intervened in Kodiak's case. Kodiak, EOG, and HRC (hereinafter "the oil and gas companies") argued the tribal court lacked jurisdiction over them and sought declaratory and injunctive relief. The two cases were eventually consolidated. The district court denied the tribal court judge's motion to dismiss and granted the oil and gas companies' motion for a preliminary injunction. The Forth Berthold chief district judge and clerk of court (collectively "the tribal court officials") and the tribal court plaintiffs separately appealed.

## II. Analysis
## A. Tribal Sovereign Immunity

The tribal court officials argue this suit is barred by tribal sovereign immunity. The district court correctly rejected this argument.

Indian tribes are "quasi-sovereign nations." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 71 (1978). Tribes "exercise 'inherent sovereign authority'" and "remain 'separate sovereigns pre-existing the Constitution.'" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (first quoting *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991); then quoting *Santa Clara Pueblo*, 436 U.S. at 56). Yet as "domestic dependent nations," tribes "are subject to plenary control by Congress." *Id.* (quoting *Citizen Band Potawatomi*, 498 U.S. at 509). By virtue of their limited sovereignty, tribes possess (subject to

-4-

congressional limitation or expansion) the "common-law immunity from suit traditionally enjoyed by sovereign powers." *Id.* (quoting *Santa Clara Pueblo*, 436 U.S. at 58). This immunity extends to tribal officials who act within the scope of the tribe's lawful authority. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1471 (8th Cir. 1994).

In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized sovereign immunity does not bar "certain suits seeking declaratory and injunctive relief against state officers in their individual capacities" based on ongoing violations of federal law. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997). The *Ex parte Young* doctrine rests on the premise "that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011). The Supreme Court has extended the *Ex parte Young* doctrine from state officials to tribal officials, holding "tribal immunity does not bar such a suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct." *Bay Mills*, 572 U.S. at 796; *see also N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.*, 991 F.2d 458, 460 (8th Cir. 1993).

Here, the oil and gas companies seek only declaratory and injunctive relief, not damages. They also contend the tribal court officials exceeded the scope of their lawful authority. Thus, this case falls squarely within the *Ex parte Young* doctrine and is not barred by tribal sovereign immunity.

To avoid this obvious conclusion, the tribal court officials argue the oil and gas companies "never claimed, let alone showed, that [they] did anything regarding the underlying tribal court case." In other words, the oil and gas companies should have named the presiding judge as a defendant, not just the chief judge and clerk of court. This raises the question of whether the tribal court officials' supervisory and

administrative authority is a sufficient connection to the improper exercise of jurisdiction to be subjected to suit for declaratory and injunctive relief. In *Ex parte Young*, the Supreme Court held that when seeking to enjoin the enforcement of an unconstitutional state statute, the state officer defendant "must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." 209 U.S. at 157; *see also Balogh v. Lombardi*, 816 F.3d 536, 546 (8th Cir. 2016) (state officials with authority to implement statute "in an administrative or ministerial sense" generally do not have sufficient connection to the statute's enforcement); *Church v. Missouri*, 913 F.3d 736, 750 (8th Cir. 2019) ("Like in *Balogh*, appointing members of the [Missouri State Public Defender] Commission is an administrative act. It does not give the governor some connection to the State's Sixth Amendment obligation [to provide indigent defendants with adequate counsel]." (internal citation omitted)). So too, when seeking to enjoin an improper exercise of tribal court jurisdiction, the tribal official "must have some connection with the" exercise of jurisdiction. *Ex parte Young*, 209 U.S. at 157. But where a tribal official is giving effect to the unlawful exercise of jurisdiction "in a manner that allegedly injures a plaintiff and violates his constitutional rights, an action" for injunctive or declaratory relief is available against the tribal official. *McDaniel v. Precythe*, 897 F.3d 946, 952 (8th Cir. 2018). Because the chief district court judge and clerk of court have supervisory and administrative duties related to the tribal court case, we conclude they have a sufficient connection to the improper exercise of jurisdiction and are properly subject to suit for declaratory and injunctive relief.

Next, the tribal court officials argue that no jurisdiction has been exercised thus far in the tribal court litigation over the merits of the controversy. All the tribal court has done is determine whether it has jurisdiction. And every court has the jurisdiction to determine whether it has jurisdiction over a case. *See, e.g.*, *In re Brewer*, 863 F.3d 861, 868 (D.C. Cir. 2017) ("[Federal courts] have jurisdiction to determine [thei]r own jurisdiction."); *Carlson v. Allianz Versicherungs-Aktiengesellschaft*, 287 Neb.

-6-

628, 638 (2014) ("It is fundamental that a court has the power to determine whether it has jurisdiction over the matter before it."). While this argument is framed as a sovereign immunity issue, in substance it is an argument about ripeness — an argument that the case is not ripe because the tribal court has not yet exercised jurisdiction over the merits of the controversy. Assuming the tribal court had jurisdiction to determine its own jurisdiction, the oil and gas companies' case is still ripe because the tribal court's exercise of jurisdiction over the merits of the case was "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (discussing pre-enforcement challenges). Indeed, it would be puzzling for the tribal court to determine it had jurisdiction over the case only to refrain from exercising that jurisdiction.[2]

We conclude the oil and gas companies' claims for declaratory and injunctive relief against the tribal court officials are not barred by tribal sovereign immunity.

## B. Preliminary Injunction

The district court did not abuse its discretion in granting the preliminary injunction because the oil and gas companies are likely to prevail on the merits.

"Our review of a preliminary injunction is layered: fact findings are reviewed for clear error, legal conclusions are reviewed de novo, and the 'ultimate decision to

---

[2]While the MHA Nation Supreme Court concluded the tribal court could exercise jurisdiction over the oil and gas companies, it disagreed with the tribal district court that the tribal court plaintiffs were not required to exhaust their administrative remedies with the U.S. Department of Interior's Bureau of Land Management and remanded for further proceedings. Nevertheless, we believe this case still presents a live case or controversy for us to decide. The tribal district court case remains pending and has not been dismissed. Even after the remand, the tribal court plaintiffs sought to certify their proposed class of plaintiffs and have asserted to this court that they are excused from exhaustion because doing so would be futile.

grant the injunction' is reviewed for abuse of discretion." *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750, 754 (8th Cir. 2018) (quoting *McKinney ex rel. NLRB v. S. Bakeries, LLC*, 786 F.3d 1119, 1122 (8th Cir. 2015)). The factors for evaluating whether a preliminary injunction should be issued are: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). "While 'no single factor is determinative,' the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citations omitted) (quoting *Dataphase*, 640 F.2d at 113).

## 1. Tribal Court Exhaustion

The district court correctly concluded the oil and gas companies exhausted their tribal court remedies[3] by moving to dismiss the case for lack of jurisdiction and appealing the issue to the MHA Nation Supreme Court. Before challenging an exercise of tribal court jurisdiction in federal court, parties must generally exhaust their challenge in tribal court. *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16–19 (1987); *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 855–57 (1985). But this requirement is not jurisdictional, it is a prudential rule based in "[r]espect for tribal self-government," allowing "the tribal court a 'full opportunity to determine its own jurisdiction.'" *Strate v. A-1 Contractors*, 520 U.S. 438, 451 (1997) (quoting *Iowa Mut. Ins.*, 480 U.S. at 16). And exhaustion is not required

---

[3]One of the oil and gas companies argues we lack jurisdiction to review the district court's determination of exhaustion of tribal remedies because the district court addressed that issue in denying the tribal court officials' motion to dismiss. We review the issue not because we have jurisdiction to review the denial of the motion to dismiss but because it bears on the oil and gas companies' likelihood of success on the merits.

-8-

where it is "plain" the tribal court lacks jurisdiction or where exhaustion "would serve no purpose other than delay." *Id.* at 459 n.14; *see also Belcourt Pub. Sch. Dist. v. Davis*, 786 F.3d 653, 656 n.2 (8th Cir. 2015).

The tribal court officials and tribal court plaintiffs argue that even though the oil and gas companies pursued their jurisdictional challenge to the MHA Nation Supreme Court, they still did not adequately exhaust their remedies because they only raised a facial challenge to tribal court jurisdiction. "Exhaustion of [tribal] court remedies requires development of the factual record in the Tribe's Court," they claim, pointing to this court's decision in *Duncan Energy Co. v. Three Affiliated Tribes of Ft. Berthold Reservation*, 27 F.3d 1294 (8th Cir. 1994). This court's opinion in *Duncan Energy* does not require the development of a factual record in every case (nor would such a requirement likely be consistent with subsequent Supreme Court precedent). *See id.* at 1299–1301. Rather, in *Duncan Energy* we said "the requirement of tribal exhaustion contemplates the development of a factual record that will serve the 'orderly administration of justice in the federal court.'" *Id.* at 1300 (quoting *Nat'l Farmers*, 471 U.S. at 856). While the development of a factual record may generally be required where a challenge to tribal court jurisdiction turns on disputed factual questions, factual development is generally not required for facial challenges to jurisdiction. Requiring the development of a factual record where the jurisdictional challenge does not turn on issues of fact would not serve the "orderly administration of justice," *Nat'l Farmers*, 471 U.S. at 856, and "would serve no purpose other than delay," *Strate*, 520 U.S. at 459 n.14.

## 2. Tribal Court Jurisdiction

The district court correctly concluded the tribal court lacked jurisdiction over the oil and gas companies.

The Supreme Court in *Montana* said that while Indian tribes possess "attributes of sovereignty over both their members and their territory," they "have lost many of the attributes of sovereignty" through "their original incorporation into the United States as well as through specific treaties and statutes." 450 U.S. at 563 (quoting *United States v. Wheeler*, 435 U.S. 313, 326 (1978)). Thus, "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Id.* at 564.

We conclude the tribal court lacked jurisdiction over the oil and gas companies for two reasons. First, as to non-members, tribal courts are not courts of general jurisdiction and oil and gas leases on allotted trust lands are governed by federal law, not tribal law. Second, neither of the two exceptions in *Montana* to the general rule that tribes may not regulate the activities of non-members applies here.

*a. Tribal Court Jurisdiction over Federal Causes of Action*

The oil and gas companies argue the tribal court lacks jurisdiction because: (a) tribal court adjudicatory jurisdiction is, in the absence of congressional authorization, limited to tribal law, and (b) the suit at issue here is a federal cause of action. The tribal court officials and tribal court plaintiffs counter that the first premise of this argument rests on an incorrect reading of *Nevada v. Hicks*, 533 U.S. 353 (2001), which they assert "must be viewed narrowly," and that tribal courts may hear federal causes of action in some circumstances. We agree with the oil and gas companies and address their two contentions in turn.

In *Hicks*, the Supreme Court held that tribal courts are not courts of general jurisdiction — unlike state courts that "can adjudicate cases invoking federal statutes . . . absent congressional specification to the contrary." *Hicks*, 533 U.S. at 366. The Court held that because "no provision in federal law provides for

-10-

tribal-court jurisdiction over [42 U.S.C.] § 1983 actions . . . tribal courts cannot entertain § 1983 suits." *Hicks*, 533 U.S. at 368–69. The Supreme Court's holding in *Hicks* brought to the fore an ambiguity in the Court's prior holding that "[a]s to nonmembers . . . a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction." *Strate*, 520 U.S. at 453. The ambiguity is whether tribal court adjudicative jurisdiction is limited to cases arising from conduct that *could be* permissibly regulated by tribal law, as determined by *Montana* and its two exceptions, or whether tribal court adjudicative jurisdiction is limited to cases arising from conduct that *has been* regulated by tribal law, i.e., limited to causes of action arising under tribal law.

We conclude the better reading of *Hicks* is that, at least where non-members are concerned, tribal courts' adjudicative authority is limited (absent congressional authorization) to cases arising under tribal law.[4] First, the Supreme Court did not just reject tribal court adjudicative jurisdiction over § 1983 actions based on conduct falling outside the *Montana* exceptions. *See Hicks*, 533 U.S. at 366–69. Rather, it concluded tribal courts lack jurisdiction to hear any § 1983 claims. *See id.* Second, the Court's other reasoning in *Hicks* supports this reading. The Court emphasized the lack of congressional authorization for tribal courts to hear § 1983 claims and that allowing tribal court jurisdiction would deny defendants access to a federal forum through removal, as defendants have in a state court action. *See id.* Here too, there is no congressional authorization for tribal courts to hear suits involving oil and gas leases of allotted Indian trust land. And the absence of a federal forum is a concern that applies not just to § 1983 actions, but any time a federal claim is heard in tribal court. Finally, this reading is consistent with the Court's broad principle that "[w]here nonmembers are concerned, the 'exercise of tribal power beyond what is

_____

[4]Even if tribal courts' authority were not limited to tribal law, the tribal court lacked authority over the oil and gas companies here because its exercise of jurisdiction did not fit into either of the *Montana* exceptions, as discussed below.

-11-

necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.'" *Id.* at 359 (emphasis omitted) (quoting *Montana*, 450 U.S. at 564). Given the Supreme Court's reasoning in *Hicks*, we conclude the better reading is that tribal courts lack jurisdiction to adjudicate federal causes of action absent congressional authorization.[5]

We also agree with the oil and gas companies that the tribal court plaintiffs' claim for relief is based on federal law.

Under the General Allotment Act of 1887, 24 Stat. 388, many Indian lands were divided and allotted to individual Indians but were held in trust for their benefit by the federal government. *See Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1652–53 (2018); 25 U.S.C. §§ 334–358. In 1909, Congress passed an act authorizing the leasing of allotted lands for "mining purposes," including the extraction of oil and gas. 25 U.S.C. § 396; *see also* 25 C.F.R. § 212.3. But such leases must be approved by the Secretary of the Interior, who "is authorized to perform any and all acts and make such rules and regulations as may be necessary." 25 U.S.C. § 396. Leases are required to "be on forms, prescribed by the Secretary [of

---

[5]This conclusion is consistent with *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473 (1999), which affirmed the denial of an injunction against the exercise of tribal court jurisdiction over claims under the Price-Anderson Act (Atomic Energy Damages Act). The Supreme Court in *Hicks* distinguished *El Paso* by explaining that in *El Paso* "the claims were not initially federal claims, but [tribal law] tort claims that the Price-Anderson Act provided [in 42 U.S.C. § 2014(hh)] 'shall be deemed to be . . . action[s] arising under' 42 U.S.C. § 2210." *Hicks*, 533 U.S. at 368 (alterations in original). Because the claims at issue in *El Paso* were tribal law claims (governed by tribal law to the extent not inconsistent with the Price-Anderson Act, § 2014(hh)) "deemed" to be federal claims, *El Paso* does not stand for the broad proposition that tribal courts have jurisdiction to entertain federal causes of action absent congressional authorization.

the Interior]," which may only be changed with the Secretary's approval. 25 C.F.R. § 211.57; *see also id.* § 212.57. The lease included in the record here is a form lease and requires the lessee "[t]o abide by and conform to any and all regulations of the Secretary of the Interior now or hereafter in force relative to such leases."

Federal regulations control nearly every aspect of the leasing process, such as how leases are awarded, *id.* § 212.20, the size of land that may be included in a single lease, *id.* §§ 211.25, 212.25, the duration of leases, *id.* §§ 211.27, 212.27, the spacing of oil wells, *id.* § 212.28(h), the rates of royalties for oil and gas leases, *id.* § 212.41, the manner of payment, *id.* §§ 211.40, 212.40, and more. And the Bureau of Land Management extensively regulates and monitors oil and gas drilling operations. *See* 43 C.F.R. pt. 3160; *see also* 25 C.F.R. § 212.4.

Federal law also controls the entire process of royalty payments under the Federal Oil and Gas Royalty Management Act. *See* 30 U.S.C. §§ 1701–1759. Royalties are paid to the Department of Interior's Office of Natural Resources Revenue, which in turn disburses the royalties to the allottees, *see id.*; 30 C.F.R. §§ 1218.100–1218.105, 1219.103, and federal law provides for penalties for failure to pay royalties due under a lease, *see* 30 U.S.C. § 1719. Relevant to this case, the Department of the Interior has issued a notice specifically addressing the issue of "Royalty or Compensation for Oil and Gas Lost" by flaring. U.S. Dep't of the Interior Geological Survey Conservation Div., NTL-4A ("Flaring Notice") (1980). In sum, "[t]he total of these regulations is comprehensive, giving wide powers to [the Department of the] Interior as to all aspects of the leasing arrangement." *Pawnee v. United States*, 830 F.2d 187, 190 (Fed. Cir. 1987); *see also Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 892 F. Supp. 2d 285, 292 (D.D.C. 2012) ("[T]he royalties program for federal and Indian oil and gas leases is 'a complex and highly technical regulatory program' which requires 'significant expertise' and the 'exercise of judgment grounded in policy concerns' by the Department [of the Interior]." (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994))).

Unlike "routine contracts" that are "governed by general common law principles of contract," oil and gas leases on federally-held Indian trust land are governed by federal law. *See Comstock Oil & Gas Inc. v. Alabama & Coushatta Indian Tribes of Tex.*, 261 F.3d 567, 573–75 (5th Cir. 2001); *see also Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians*, 317 F.3d 840, 847 (8th Cir. 2003) ("In terms of [federal question] jurisdiction there is a significant distinction between ordinary contract disputes involving Indian tribes, and those raising issues in an area of extensive federal regulation." (citation omitted)); *Naegele Outdoor Advert. Co. v. Acting Sacramento Area Director, Bureau of Indian Affairs*, 24 IBIA 169, 177 (1993) (Interior Board of Indian Appeals) ("[T]he construction of Federal contracts, including contracts approved on behalf of an Indian or Indian tribe by the Secretary of the Interior in his fiduciary capacity, is a question of Federal law.").

Because the tribal courts' adjudicative authority is limited to cases arising under tribal law and the case at issue here arises under federal law, we conclude the tribal court lacked jurisdiction.

Finally, we note that if the tribal court plaintiffs were attempting to proceed under tribal contract law, such tribal law would be preempted. The tribal court officials and tribal court plaintiffs primarily argue it does not matter whether the tribal court plaintiffs' cause of action arises under federal or tribal law. But there is some suggestion in their briefs that it is based in the "MHA [Nation] common law" of contracts. To the extent it is based on tribal contract law, the enforcement of such tribal law would not only be impermissible under *Montana* and its progeny, as discussed below, but would also be preempted. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018) (discussing field preemption); *Arizona v. United States*, 567 U.S. 387, 401 (2012) (same). Federal law and regulation exhaustively occupies the field of oil and gas leases on allotted Indian lands. And more specifically, federal law exhaustively addresses the collection and distribution of royalties on such leases and the practice of flaring natural gas as it relates to

-14-

royalty payments.  *See* 30 U.S.C. §§ 1701–1759; 30 C.F.R. §§ 1281.100–1218.105, 1219.103; Flaring Notice.  Congress has left no room for tribal law to supplement this comprehensive regulatory scheme.

### b. *Tribal Court Jurisdiction over Non-Indians*

Aside from the tribal court's lack of jurisdiction to hear federal causes of action, the tribal court lacked jurisdiction because the subject of the dispute was outside its legislative jurisdiction.  The scope of tribes' legislative jurisdiction vis-à-vis non-members is determined by the Supreme Court's *Montana* opinion and its progeny.

The general rule is Indian "tribes do not, as a general matter, possess authority over non-Indians who come within their borders."  *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 328 (2008); *see also Montana*, 450 U.S. at 565 ("[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.").  Given their "diminished status as sovereigns," the Supreme Court has said "the Indian tribes have lost any 'right of governing every person within their limits except themselves.'"  *Montana*, 450 U.S. at 565 (quoting *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 209 (1978)).

The Supreme Court in *Montana* recognized two exceptions where tribes may exercise civil jurisdiction over non-members: (1) "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements," and (2) "A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."  *Id.* at 565–66.

-15-

But the Supreme Court has said "[t]hese exceptions are 'limited' ones and cannot be construed in a manner that would 'swallow the rule' or 'severely shrink' it." *Plains Commerce Bank*, 554 U.S. at 330 (citations omitted) (first quoting *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 647, 655 (2001); then quoting *Strate*, 520 U.S. at 458). The *Montana* exceptions apply only to the extent they are "necessary to protect tribal self-government or to control internal relations." *Hicks*, 533 U.S. at 359 (emphasis omitted); *see also Plains Commerce Bank*, 554 U.S. at 332; *Montana*, 450 U.S. at 564.

The first *Montana* exception does not apply here. The oil and gas companies' leases are consensual relationships with tribal members, but the entire relationship is mediated by the federal government. A consensual relationship alone is not enough. Even where there is a consensual relationship with the tribe or its members, the tribe may regulate non-member activities only where the regulation "stem[s] from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations." *Plains Commerce Bank*, 554 U.S. at 336. The complete federal control of oil and gas leases on allotted lands — and the corresponding lack of any role for tribal law or tribal government in that process — undermines any notion that tribal regulation in this area is necessary for tribal self-government. And the relevant conduct by the oil and gas companies is the failure to pay the disputed royalties, an activity that takes place between the non-member companies and the federal government (which in turn calculates and makes payments to the allottees). Tribal regulation of these payments is not necessary for tribal self-government or controlling internal relations. The fact the allotted land at issue here is held in trust for individual tribe members does not change our conclusion. *See Hicks*, 533 U.S. at 360 ("The ownership status of land . . . is only one factor to consider in determining whether regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.'").

-16-

Nor does the second *Montana* exception apply. Again, this second exception "grants Indian tribes nothing 'beyond what is necessary to protect tribal self-government or to control internal relations.'" *Atkinson Trading*, 532 U.S. at 658–59 (quoting *Strate*, 520 U.S. at 459). This dispute over the payment of royalties does not involve conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. The oil and gas companies' failure to pay the disputed royalties related to the flaring does not "'imperil the subsistence' of the tribal community," as is required to satisfy the second exception. *Plains Commerce Bank*, 554 U.S. at 341 (quoting *Montana*, 450 U.S. at 566). Importantly, while the tribal court plaintiffs initially relied in part on an MHA Nation resolution that purported to regulate the practice of flaring on the reservation, they subsequently abandoned that reliance in favor of a straightforward contract-based approach. Tribal court enforcement of tribal laws relating to public health and safety or environmental protection may sometimes fall within the second *Montana* exception, but the dispute here, according to the tribal court plaintiffs, "is a contract dispute, pure and simple." Adjudicating disputes over the payment of royalties under a system for payment of such royalties wholly controlled by the federal government under federal law is not "necessary to protect tribal self-government or to control internal relations.'" *Atkinson Trading*, 532 U.S. at 658–59 (quoting *Strate*, 520 U.S. at 459).

Based on the foregoing, we conclude the oil and gas companies have shown a strong likelihood of success on the merits.

### 3. Other Preliminary Injunction Factors

Having concluded the oil and gas companies are likely to prevail on the merits, we turn to the remaining preliminary injunction factors. *See Dataphase*, 640 F.2d at 113. While the threat of irreparable injury to the oil and gas companies is uncertain, *see DISH Network Serv. L.L.C. v. Laducer*, 725 F.3d 877, 882 (8th Cir. 2013), we

conclude the balance of the factors favors them. Without the injunction, the oil and gas companies would be forced to expend the time and cost associated with continuing litigation in a tribal court that lacks jurisdiction over them, whereas the only possible injury to the tribal court plaintiffs and tribal court officials from the injunction is delay. The balance of these factors, along with the oil and gas companies' strong likelihood of success on the merits, show the district court did not abuse its discretion by granting the preliminary injunction.

## III. Conclusion

For the reasons set forth herein, we affirm the district court's grant of a preliminary injunction.[6]

---

---

[6]The tribal court officials object to the district court's failure to rule on their motion to dismiss on the basis of the failure to join the MHA Nation as a party. *See* Fed. R. Civ. P. 19. Because the district court has not yet ruled on this issue, we lack appellate jurisdiction to review its failure to decide the issue.